**Felix GORE, Plaintiff,**
v.
**GORMAN'S Incorporated, Defendant.**
No. 9643.

United States District Court
W. D. Missouri, W. D.
April 19, 1956.

Ray D. Jones, Jr., Kansas City, Mo., for plaintiff.

Jules E. Kohn, Ralph J. Tucker, Kansas City, Mo., for defendant.

DUNCAN, Chief Judge.

This is an action to recover damages, actual and punitive, for malicious prosecution in attempting to collect an account which had been discharged in bankruptcy. The defendant introduced no evidence, and the facts are not in dispute.

The plaintiff, a resident of the State of Kansas, owed the defendant Gorman's Inc., an account, apparently for merchandise purchased by him, and on May 20, 1953, the defendant obtained a judgment against the plaintiff in the Magistrate Court in Kansas City, Missouri, in the sum of $463.46. (At that time the plaintiff was a resident of Missouri). Thereafter, plaintiff filed a petition in bankruptcy, scheduling the above judgment as an obligation. The claim was allowed and plaintiff was discharged in bankruptcy in April 1954, which discharge included the judgment due and owing to the defendant.

Within a short time after the discharge, collectors for the defendant began calling plaintiff at his place of employment, insisting that he pay the obligation. He reminded them of what they already knew, that he had taken

bankruptcy, and that he had been discharged from the obligation owed the defendant. However, they continue to demand payment of him, and finally, on November 19, 1954, a second suit was brought against the plaintiff on this debt by "Namrog Investment Company, Inc.," in the Justice of the Peace Court of Harry E. Pearce, within and for Quindaro Township, Wyandotte County, Kansas, in the amount of $300, said amount being the jurisdictional amount of that court. It is admitted that the indebtedness claimed to be due the defendant was for the same amount for which it had received judgment in the Magistrate Court at Kansas City, Missouri, and which had been listed and discharged in bankruptcy. The amount was reduced to $300 solely for the purpose of keeping within the jurisdiction of the Justice of the Peace Court.

The name "Namrog" is "Gorman" spelled backward, and this was the name of the company used by Gorman's Inc., in its collections. It is admitted that whatever actions were taken by "Namrog" were taken as the agent of the defendant, and that the defendant is responsible for them.

On the same day that the second suit was filed, a request was filed for a "garnishee's summons". The notation on the request was "Balance of Account of $463.62. Last payment Aug. 15, 1952. Send him in to me. Sure, this one is rough. No other release. I have a bad check." On November 23, 1954, the "garnishee's summons" was issued by the Justice of the Peace, intended to be returnable on December 6, but erroneously stated as returnable on November 6. There is no dispute about this fact. The summons was immediately served by the Marshal on Helms, Inc., plaintiff's employer, garnishing his wages then due and to become due.

Thereafter, the plaintiff, in an attempt to have the garnishment released, discussed the matter with several persons in positions of authority with the defendant, but was unable to do so. The request for the issuance of the garnishment, as shown thereon in the hand-writing of a representative of the defendant, stated, for the benefit apparently of the Justice of the Peace, that the only way to have the matter released was for the plaintiff to present himself to the defendant, that it was a rough case. The employees of the defendant with whom the plaintiff discussed the question of release, told him that they had no authority to release the garnishment, except through payment, and that he would have to see Mr. Gorman. Plaintiff testified that he made several attempts to see Mr. Gorman, but was told each time that he would not be permitted to do so. Finally, he went to a lawyer and through the efforts of the lawyer, the garnishment was released on November 29, 1954.

It appears that the credit manager of defendant had been designated by the Justice of the Peace as a clerk of the court for the purpose of executing releases of such garnishment proceedings instituted by his employer, and it was he who finally executed the release here.

Plaintiff's regular pay days were on the 15th and 30th or 31st of each month, so at the time of the service of the garnishment on the 23rd of November, 1954, there was due and owing him from the employer garnishee, such sums as may have been earned by him after the pay day on the 15th, and it was released before his pay day on November 31.

Plaintiff states that during the time the garnishment was pending, he discussed the matter with his employers, and that he was told that he would have to clear it up if he expected to keep his job.

After the garnishment was released, he remained in the employ of Helms, Inc., until March 31, 1955, at which time he either left its employ, or was discharged. He says that he was discharged, and the credit manager, who testified on behalf of plaintiff, says that he left of his own free will. It is revealed in evidence, however, that two other incidents occurred with respect to obligations owed by the plaintiff, subsequent to the one in controversy here, one of which was a criminal matter, and plaintiff says that it was the accumulation of the incidents, including the one

in controversy here, which resulted in his discharge by a Mr. Bushey, an executive of Helms, Inc. The "bad check" referred to in the memorandum attached to the "garnishee's summons" had no connection with the account on which the claim in controversy was based.

During his employment by Helms, Inc., plaintiff was earning $350 to $375 per month, which included a fixed weekly amount and commissions. After he left Helms, Inc., he immediately went to work for a tire company at $75 a week and commissions, where he earned approximately $500 a month, so, whether he was discharged or not, as a result of the garnishment proceedings, the evidence fails to reveal that he suffered any loss of earnings. In fact, he had a better job than he had while employed by Helms.

Plaintiff seeks to recover damages for mental anguish, embarrassment and other inconveniences by way of punitive damages, as a result of the garnishment. He says that his sales fell off, and that he was much disturbed and grieved by other peoples' impressions of him, growing out of this garnishment. It is difficult to conceive that he was greatly mortified or embarrassed as a result of this transaction, in view of the fact that his bankruptcy schedule showed indebtedness of various types and kinds of approximately $12,000. I do not make this observation as a reflection on the plaintiff, or because he did take bankruptcy, which he had a perfect right to do, but I am unable to see how he became sensitive so suddenly as a result of one of his financial obligations.

The defendant offered no evidence, and the basic facts are not in dispute; the only factual question in dispute is whether or not there was any actual damages. The plaintiff testified that he consulted a lawyer, and that the lawyer brought about the release of the garnishment, and for that service, he was charged $35. Certainly this is an out-of-pocket expense or obligation as a result of the garnishment, but I am unable to find evidence of any other actual damage which was sustained by him.

There is no question about the knowledge of the defendant that the judgment obtained against plaintiff in Missouri was scheduled in bankruptcy, and that plaintiff was discharged. The "account" which was the basis of the suit in the Justice of the Peace Court of Kansas was the same account which had been reduced to judgment in Kansas City, Missouri, and which was scheduled in bankruptcy. Between the time he was discharged in bankruptcy and the time the new suit was brought against him in Kansas on the same obligation, plaintiff apparently received numerous calls from the collectors of the defendant insisting that he pay the obligation; some of them were undoubtedly of a threatening nature, i. e., by "threatening" I mean that they would resort to some means of forcing collection if he did not pay up.

I think there can be no doubt that plaintiff was harassed by these calls and was subjected to embarrassment by reason of them. It seemed to be the attitude of the defendant's collectors that they proposed to press collection of the account to the point where it created such pressure that defendant would be required to pay in self-defense, although they well knew collection could not legally be enforced. Defendant certainly well knew the effect of a garnishment proceeding and its effect upon an employee —few employers will countenance such proceedings against their employees.

The defendant bases its defense upon the legal ground that it had a right to bring the action in Kansas by "summons to Garnishee" upon the same account which had been reduced to judgment in Missouri, and from the obligation of which plaintiff had been discharged in bankruptcy; that a discharge in bankruptcy is not an extinguishment of the debt, but is simply a bar to legal enforcement of the debt after the discharge in bankruptcy, if affirmatively pleaded by debtor. Defendant insists that it cannot be made to answer in damages for malicious prosecution for doing what it had a right to do under the law.

Defendant cites numerous cases to sustain its position, including the statement

in Collier on Bankruptcy, Vol. II § 17.31—

"A discharge in bankruptcy is only available as a plea in bar and must therefore be regularly pleaded."

The defendant also cites Helms v. Holmes, 4 Cir., 129 F.2d 263, 266, 141 A.L.R. 1367, in which the court said:

"It must be remembered that a discharge in bankruptcy is neither a payment nor an extinguishment of debts. It is simply a bar to their enforcement by legal proceedings. * * * And no court, other than the bankruptcy court, is bound to take judicial notice of the discharge, unless it is pleaded as a release. * * * Nor is a creditor guilty of contempt of the bankruptcy court in suing on the old debt in the state court, even though he has notice of the debtor's discharge. In re Weisberg, D. C., 253 F. 833, 834. * * *

"Thus the bankrupt is merely given a personal defense which is waived if he chooses not to avail himself of it. This rule that a failure so to plead operates in law as a waiver of the defense has been uniformly followed by State and Federal Courts alike." (Citing cases.)

The Bankruptcy Act, § 35 Title 11 U.S.C.A. provides:

"A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except * * *." (The exceptions are not important in a discussion of this case).

It is difficult for me to reconcile what apparently has been accepted as the general rule in the past with respect to the effect of a discharge, and what is the clear provision of the statute which says that a discharge in bankruptcy shall *release* a bankrupt. If "release" doesn't mean what it says, then a discharge in bankruptcy becomes a mere procedural matter and affords little or no protection to one who has availed himself of its provisions.

If a creditor may continue to bring actions in state courts, or otherwise, on a claim which has been discharged in bankruptcy, wherever service may be had upon the bankrupt, well knowing that the claim has been discharged in bankruptcy, thus making it necessary for the bankrupt to employ counsel and incur expenses in defending the action upon a claim, for the payment of which he has been released, the whole purpose for which the bankruptcy act was enacted has been completely lost and destroyed so far as he is concerned.

The whole trend of the modern bankruptcy laws has been that of liberalization, thus enabling those who find themselves hopelessly in debt, to relieve themselves of their obligations, and start anew and free of their previous financial difficulties, subject always of course, to the orders and restrictions of the bankruptcy court. There can certainly be no other purpose for the enactment of the bankruptcy laws. Congress has recognized the need and necessity for the liberalization of the bankruptcy laws in the passage of the Chandler Act in 1938, thus affording much broader opportunities for both business and individuals to seek relief from burdensome debts from which they could never in any other way be released. If such a narrow construction is to be placed upon the effect of discharge, after having taken advantage of these laws, then the whole purpose, as heretofore stated, has been completely destroyed, because the creditor may continue to attempt to enforce its collections until it has finally coerced a bankrupt debtor into paying the discharged obligation, or, as an alternative, to incur the expense of defending himself all over again.

If the defendant is right in its contention with respect to this matter, then the thousands of wage-earners who have taken advantage of Chapter XIII and entered into a composition with their creditors, may find themselves again facing garnishment proceedings, and resultant discharge from their employment, unless they incur the expense of going into

court to defend themselves. I think it would be reasonable to assume that the same construction would be placed on § 1060 Title 11 U.S.C.A. as placed upon § 35 heretofore quoted. § 1060 provides:

"Upon compliance by the debtor with the provisions of the plan and upon the completion of all payments to be made thereunder, the court shall enter an order discharging the debtor from all his debts and liabilities provided for by the plan, * * *."

The only difference between the two provisions is that § 35 uses the word "release" whereas § 1060 uses the word "discharge". I fail to find any difference between the legal effect of the word "release" and the word "discharge".

In Seaboard Small Loan Corp. v. Ottinger, 4 Cir., 50 F.2d 856, 859, 77 A.L.R. 956, Judge Parker (now chief judge of the 4th Circuit) said, among other things:

"In view of this purpose of the act and of the express provision that the bankrupt shall be released from all provable debts, it would be indeed a strange situation if the court vested with jurisdiction to enforce the act were without power to stay the hand of a creditor whose debt has been discharged by bankruptcy, but who nevertheless persists in harassing the bankrupt with efforts to collect it. It will not do to say that the bankrupt has an adequate remedy at law by pleading the discharge in case of suit, or by suing an employer if the latter withholds wages under an order such as that here. Such remedy is not adequate, because its assertion involves trouble, embarrassment, expense, and possible loss of employment. A laboring man who had availed himself of the benefits of the act would in many cases prefer to pay a debt discharged by bankruptcy rather than hazard his employment by bringing suit for wages withheld under notice like that with which we are dealing. And an employer in many cases would prefer to discharge an employee against whom a claim had been filed rather than engage in litigation with the claimant. The demand under an assignment order, in an effort to collect a debt discharged by bankruptcy, is nothing less than an attempt to circumvent the order discharging same and to deprive the bankrupt of the benefit of that order. It was to meet situations such as this that the bankruptcy court was vested with the general power under section 2, subsection 15 of the Bankruptcy Act (11 USCA § 11(15) to 'make such orders, issue such process, and enter such judgments in addition to those specifically provided for as may be necessary for the enforcement of the provisions of this title.' "

Although the above case was one in which the discharged bankrupt had sought to enjoin the proceedings against him in the State Court, the situation was much like the one with which we are concerned here. If anything, this case is more aggravated than the Seaboard case. Here we have a new suit upon the same account, brought in a jurisdiction in which the Bankruptcy Court in Missouri had no jurisdiction, and also begun by garnishing debtor's wages even before judgment, a proceeding which would have required the employer to come into court and file answer had it not been released before the return day by the defendant. Ordinarily employers do not like this sort of proceeding.

█ As stated by the defendant, two elements are necessary to maintain a suit for malicious prosecution—(1) want of probable cause, and (2) malice. I will first discuss the question of probable cause, and that discussion will be in light of the rule which has been relied upon by the defendant, and upon which it may be assumed it relied in bringing its action in Kansas to collect its account.

█ According to the testimony, the ink was scarcely dry upon the order of discharge, before the defendant's collectors attempted to collect the dis-

charged obligation. The plaintiff states that many calls were made at his place of employment; that he repeatedly told such collectors that the debt had been discharged in bankruptcy—a fact which they already knew. This continued until the plaintiff went to the State of Kansas, where he sought and obtained employment, and the bringing of the suit out of which this action began.

In view of these facts, it would seem clear that the defendant could have had no doubt but that the plaintiff was relying upon, and did rely upon the discharge in bankruptcy, and that suing him again in another court in another state on the same claim would not result in a collection of the debt. It could only have been for the purpose of harassment, and was entirely without probable cause to believe that such an action would aid in the slightest degree in the collection of its debt.

Second, is the question of malice. Considering the facts which have been heretofore discussed, as true, what actuated the defendant in pursuing its attempts to collect the discharged obligation after it had been repeatedly advised that the debt had been discharged in bankruptcy and plaintiff would not for that reason pay the debt?

In order to institute its action in the Justice of the Peace Court in Kansas, defendant had to reduce the amount from $463 to $300. Suit was not brought in that state upon a foreign judgment, but upon the account itself, credit having been given for the difference between $300 and $463. Further, to carry out its purpose, defendant proceeded under the Kansas statute, which it had a right to do if it had a right to bring the suit at all, immediately to garnish the plaintiff's wages before judgment had been obtained upon the account which had been discharged in bankruptcy. Not satisfied with that, the defendant's agents wrote upon the summons—"Send him to me. Sure, this one is rough. No other way of release. I have a bad check on him."

Thereafter, the plaintiff's testimony reveals, and there is no denial of it, that he made repeated efforts to see Mr. Gorman, but was told by his employees that he could not do so, and that they had no authority to release the claim, although that fact is not borne out by the evidence, because the credit manager for the defendant had been appointed, in writing, as a clerk of the court by the Justice of the Peace before whom the case was pending, for the purpose of releasing garnishments which had been brought by the defendant in that court, and the garnishment was finally released by the credit manager of the defendant when an attorney was employed by the plaintiff to effect the release. Under this set of facts, it seems to me that it must be assumed that the methods employed by the defendant clearly revealed malice on its part.

Finally, it is my conclusion that this case is clearly distinguishable from the cases cited by the defendant. If it is not, in view of the present bankruptcy laws, it should again be reviewed.

As heretofore stated, plaintiff's actual damage was only $35. There is no evidence that the plaintiff lost any actual wages or salary as a result of his efforts to bring about the release, or as a result of telephone calls that were made to him in an attempt to collect. Therefore, the finding of the court will be that the plaintiff is entitled to recover from the defendant, the sum of $35 as actual damages.

With respect to the matter of punitive damages, I doubt that the plaintiff sustained any great amount of embarrassment or humiliation as a result of these attempts, but it being the opinion of the court that the acts were done maliciously, the sum of $1000 will be assessed as punitive damages.

It Is Therefore Ordered, Adjudged and Decreed by the Court that the plaintiff have and recover of and from the defendant, the sum of $35 actual damages, $1000 punitive damages, and his costs herein expended.