In re Charles E. WALKER, Jr., Bankrupt.

PUBLIC FINANCE CORPORATION OF RHODE ISLAND, Plaintiff,

v.

Charles E. WALKER, Jr., Defendant.

Bankruptcy No. BK–79–228.

United States Bankruptcy Court, D. Rhode Island.

Nov. 21, 1980.

George M. Prescott, Lincoln, R.I., for debtor.

Thomas Connors, Providence, R.I., trustee.

Peter D'Amico, Providence, R.I., for plaintiff.

## DECISION ON PLAINTIFF'S COMPLAINT TO HAVE ITS DEBT DECLARED NONDISCHARGEABLE AND ON DEFENDANT'S COUNTERCLAIM FOR WRONGFUL GARNISHMENT OF WAGES

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on February 8, 11, and 12, 1980 on the complaint of Public Finance Corporation to have its debt declared nondischargeable under § 17(a)(2) of the Bankruptcy Act, and on the counterclaim of the bankrupt for attorney fees, and compensatory and punitive damages for the wrongful garnishment and withholding of his wages.

The following discussion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 752.

On July 20, 1979, Charles E. Walker, Jr. filed a voluntary bankruptcy petition listing

the plaintiff, Public Finance Corporation, as an unsecured creditor. All of the creditors listed in Schedule A–3 indicate 1978 indebtedness totaling $27,853. On October 31, 1979, Public Finance filed a complaint seeking to have its debt declared nondischargeable under § 17(a)(2) of the Bankruptcy Act, alleging that when Walker received a loan on December 1, 1978, in the amount of $2517.40, he stated his indebtedness to be $8,000, when in fact his outstanding debt at that time exceeded $25,000 as evidenced by his Schedule A–3. Public also alleges that the bankrupt misrepresented the ownership and value of certain personal property, and argues that its debt should be declared nondischargeable because it relied on these misrepresentations in making the loan in question.

The bankrupt denied all of the essential allegations of the complaint, and filed a counterclaim alleging that Public wrongfully garnished his wages after the filing of the petition, and thereafter, in bad faith, refused repeated demands for the release of said wages.

We will consider the complaint of Public Finance and the bankrupt's counterclaim separately.

## PUBLIC'S CLAIM OF NONDISCHARGEABILITY

■ The standard to be applied in determining whether a debt is nondischargeable is well known, and has been set forth by this and other courts in many cases since the enactment of the dischargeability amendments on December 18, 1970.[1] P.L. 91–467.

To prevail, a creditor bringing such an action must prove by clear and convincing evidence each of the following elements: (1) That the bankrupt made a materially false statement in writing concerning his or her financial condition, (2) That the misrepresentation was made with the intent to deceive; and (3) That the plaintiff reasonably relied upon and was misled by the

misrepresentation. *See, Domestic Safe Deposit Co. v. Lawrence*, BK–76–18 (D.R.I. 1978); *In re Barlick*, 1 B.C.D. 412 (D.R.I. 1974); *see also, Brant v. Zangrilli*, 1 B.R. 717, (Bkrtcy.D.R.I.1979); *Susi v. O'Donnell*, BK–77–476 (D.R.I.1978).

■ Plaintiff's contention that the bankrupt made a materially false representation in his loan application rests mainly on the difference between the total debt listed on the loan application and on the bankrupt's Schedule A–3 filed with his bankruptcy petition. The debts listed on Schedule A–3 and which do not appear on the loan application are: Bloomingdale's ($444.10); Bristol County Water Co. ($52.06); Caimano Designed Interiors, Inc. ($6,176.02); Capriccio's Restaurant ($693.00); International Packaging ($2,106.30); Jordan Marsh ($451.00); Monticello's Inc. ($509.96); Providence Gas Co. ($403.47); Rhode Island Hospital Trust ($104.04); Dr. Alton Paul ($80.00); and Taylor Travel ($1,102.00).

An important factual issue is whether the omitted debts were in existence on December 1, 1978, when the bankrupt gave Public the loan application in question.

The bankrupt's attorney, George M. Prescott, Esq., testified that many of the obligations listed as 1978 debts on the bankrupt's Schedule A–3 were so scheduled due to his mistake and/or inadvertence, and that in fact many of these debts were incurred during 1979, *after* the loan in question. The bankrupt's uncontradicted testimony is that most of the revolving charge accounts, Bloomingdale's, Capriccio's Jordan Marsh and Monticello's Inc. were current on December 1, 1978, and that although he may have owed something on these accounts, they were not past due. Most of the obligations, he explained, were incurred or billed during 1979. For example, the bill from the Bristol County Water Co. was received in 1979 based on 1978 water usage, the gas bill was for service during 1979, and the doctor's bill was incurred in March, 1979.

1. *See, e. g., Sweet v. Ritter Finance Co.*, 263 F.Supp. 540 (W.D.Va. 1971); *In re Barlick*, 1 Bankr.Ct.Dec. 412 (D.R.I.1974); *In re Campbell*, No. 56018 (unreported S.D. Ohio, 1972) 47 *Am.Bankr.L.J.* 41 (1973).

The more significant undisclosed debts, and those with which we are really concerned, involve Caimano Designed Interiors, International Packaging, and Taylor Travel. The bankrupt testified that the debt to Caimano was based on a judgment obtained on June 29, 1979. (Bankrupt's Exhibit B). According to the bankrupt he did not list this debt on the loan application because his then roommate had dealt with Caimano without his knowledge and while he was out of the country, that he had not directly participated in any dealings with Caimano, and does not concede liability as to that debt. In any event, it is uncontradicted that no judgment was entered against the bankrupt on this disputed claim until after he obtained the loan in question.

The other two substantial debts listed on Schedule A–3, International Packaging and Taylor Travel, were described by the bankrupt as business expenses incurred while he worked for his former employer, International Packaging Co.

The bankrupt testified that at the time of the loan application, the debt to International Packaging was disputed, since he believed that it was offset by money due him for overrides on commissions from sales. The Taylor Travel debt was incurred by the bankrupt for business travel, which would generally be paid by the company, and which he did not consider a personal debt.

Although the bankrupt failed to list certain revolving charge accounts, the amounts due on these charges were insignificant and do not constitute material misrepresentations. As for the Caimano, International Packaging Co. and Taylor Travel debts, we find that they were incurred during 1979, that they were disputed, and that two of these debts were business expenses which the bankrupt did not consider personal obligations.

Based upon the entire record, we conclude that the plaintiff has proved neither by clear and convincing evidence, nor by a preponderance thereof, that the bankrupt made materially false representations in order to secure a loan from Public Finance, or that if any misrepresentations were made, that they were made with intent to deceive. The testimony of Charles Walker, the bankrupt, and that of his attorney, which we find credible, satisfactorily explains the difference between the debts listed on the bankrupt's loan application, and on the bankrupt's Schedule A–3.

The second basis of Public's complaint is that the bankrupt misrepresented the value of certain household furniture. The plaintiff introduced a copy of a personal property evaluation form filled out by Walker which listed furniture with an estimated value of $8,000. (Plaintiff's Exhibit No. 6). Public now contends that the bankrupt did not own the furniture, and that most of it was the property of his roommate at the time, Diana McCarty.

Walker testified that Ms. McCarty, who did own some of the furniture, accompanied him to the office of Public Finance on December 1, 1978 to pick up the loan proceeds, and helped him to describe the furniture to Dana Haberlein, the branch manager. The testimony of Mr. Haberlein supports the bankrupt's description of the circumstances surrounding the preparation of the personal property form. While he could not remember if Diana McCarty helped the bankrupt fill out the evaluation form, he believed that she supplied information regarding the furniture in the apartment. Haberlein did not recall whether Walker said he was the owner of the furniture, and did not remember asking him that question. More importantly, though, Haberlein testified that the value of the furniture was not relevant to a determination whether to approve the loan, because security in the form of household goods is seldom used to satisfy loans in default.[2]

---

2. Public Finance would have it both ways. On the one hand it claims that Ms. McCarty purchased the furniture and that it belongs to her. At the same time it argues that the furniture was purchased by Mr. Walker, and that he failed to disclose this debt. From the testimony, it appears that McCarty and Walker each purchased and paid for an undisclosed portion of the furniture. We find it unnecessary to resolve this disputed claim at this time, and, therefore, decline to do so.

On the issue of reliance, Haberlein testified that a credit check was done prior to the granting of the loan, and that even though an undisclosed creditor (Pawtucket Trust Company) was discovered, it was common in his experience for loan applicants not to list all of their creditors, and still have loans approved.

At the time of the application, Walker clearly was not a marginal candidate for a loan, but had income verified by Public of at least $2500 per month. Public's own internal work sheet used to evaluate Walker's financial condition indicated that he would be eligible for a high credit limit of $5,500, (substantially in excess of the amount actually loaned), that he had good paying habits, good income, and was an excellent risk. (Plaintiff's Exhibit No. 5). We conclude that Walker's verified earning capacity and payment history were the main factors on which Public relied in granting this loan.

For the reasons stated above, we conclude that the plaintiff has failed to meet the burden of proof necessary to have bankrupt's debt to Public Finance declared nondischargeable under § 17(a)(2) of the Bankruptcy Act, and that the complaint should be denied.

## THE BANKRUPT'S COUNTERCLAIM

The bankrupt asserts a counterclaim against Public Finance for compensatory and punitive damages, and attorney fees for the wrongful garnishment and withholding of his wages. After the filing of the petition, but before notice was mailed to creditors on August 2, Walker's wages were attached on July 24 and August 1, for a total of $491.07. At an adjourned first meeting of creditors on September 9, 1979, the attorney for Public Finance agreed to return the attached wages, stating that there would be no problem in that respect. It was not until November 2, 1979 that the funds in question were turned over to the Trustee. (Bankrupt's Exhibit A).

The bankrupt argues that these wages were wrongfully attached in the first place, and thereafter were wrongfully withheld for an unreasonable length of time (approximately three months). He also asserts that after the filing of the bankruptcy petition, Dana Haberlein phoned him almost daily and went to his home on several occasions, attempting to convince him to reaffirm the debt in question. Because of this alleged harassment, the bankrupt says he told Haberlein the name of his new employer, who was in turn contacted by Haberlein, resulting in the loss of his job when the employer learned that Walker had filed a bankruptcy petition. The bankrupt also testified that because his wages were attached, he was unable to pay his rent, and was forced to move to his parents' house, resulting in severe embarrassment.

The testimony of Peter P. D'Amico, Esq., attorney for Public Finance, regarding the events after the filing of the bankruptcy petition conflicts on several points with the description of these events by the bankrupt. According to Mr. D'Amico, the wage garnishment action was commenced before the filing of the bankruptcy proceeding, although wages were not attached until after the petition was filed. Mr. D'Amico introduced a letter he wrote dated June 15, 1979, instructing Harvey Resh, Public's Massachusetts attorney, to attach Walker's wages. (Plaintiff's Exhibit No. 9). This letter is confusing in light of the bankrupt's testimony that Public Finance did not know who his new employer was until after the petition was filed, and only obtained that knowledge by Haberlein's harassing the bankrupt through post–petition phone calls and visits. On this item Walker has not sustained his burden of proof, and with respect to this allegation, his counterclaim is denied.

We also hold that there is no authority or proof to support an award of damages with respect to Walker's claim that, by being forced to move back home with his parents, he suffered embarrassment.

■ In our view, the significant issue in this counterclaim is whether Public's delay in releasing the attached wages of the bankrupt, after notice, is so unreasonable as to warrant the imposition of damages. We hold that it is, for the following reasons.

Although the attachment of the bankrupt's wages took place before actual notice of the bankruptcy petition to creditors, the delay between the time that notice was received and when the wages were finally turned over to the trustee was almost three months. Even assuming (but we don't) that Public Finance acted reasonably in holding these wages until the adjourned first meeting of creditors on September 9, 1979, the delay in returning the bankrupt's property after this time was intentional and inexcusable.

This delay, according to Public, was occasioned by difficulty in contacting Harvey Resh, the Massachusetts attorney who was handling this matter. We find that reason not persuasive. Public, through counsel, represented to the Court at the adjourned first meeting on September 9, 1979, that it would be "no problem" to release its wage attachment, and that it would do so forthwith. It is also undisputed that Public had possession of the funds in question on October 9, 1979, almost a month before they were turned over to the Trustee. George Prescott, Esq., attorney for the bankrupt, testified that he spoke with D'Amico on several occasions in an attempt to obtain these funds for his client. A letter sent to Prescott (Bankrupt's Exhibit E) dated October 15, 1979, approximately a week *after* Public Finance had possession of the garnished wages, clearly indicates that Public Finance was still attempting to force an "arrangement" with the bankrupt regarding payment of this debt. Prescott's response to this letter was to threaten to file a motion to have Public Finance adjudged in contempt for withholding his client's wages. (Bankrupt's Exhibit F).

On the facts before us, we conclude that the delay in turning over these funds was caused solely by Public's attempt to increase its leverage or bargaining power, and to force a "settlement" or reaffirmation with the bankrupt.[3]

■ The plaintiff's refusal to return the funds in question clearly violates the express provisions and the spirit of the Bankruptcy Act. Section 11 of the Act provides that the filing of a petition operates as a stay of the commencement or continuation of any action or the enforcement of any judgment against the bankrupt. We construe the stay to include the garnishment of wages. This stay remains in effect until the bankruptcy petition is dismissed, or the bankrupt is denied a discharge, unless relief from the stay is granted by the court. *See* Bankruptcy Rule 401. The reason for the automatic stay provisions of the Act is to prevent bankrupts from being harassed by creditors pending the adjudication of applications to determine dischargeability (§ 17), or objections to discharge (§ 14). *See, Girardier v. Webster College*, 563 F.2d 1267 (8th Cir. 1977); *see also*, 1A *Collier on Bankruptcy*, ¶ 1102 at 1141 (14th ed. 1978). Put another way, the stay is intended to avoid precisely what happened in this case.

While the original garnishment may have been excusable and not willful because creditors had not yet received notice of the petition, the subsequent delay of approximately three months in turning over these funds is a different matter.

■ The conduct of Public Finance throughout this proceeding, including the violation of the automatic stay provisions of the Bankruptcy Act, exposes the plaintiff to the imposition of sanctions, *see, Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976), *cert. den'd*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540

**3.** This is a classic case of post–petition pressure by creditors which was recognized by Congress in its deliberations and reflected in its enactment of § 524 of the Bankruptcy Reform Act of 1978 dealing with reaffirmation. This section requires that before any reaffirmation agreement becomes enforceable, a hearing be held to determine whether the agreement imposes an undue hardship on the debtor, and whether it is in the debtor's best interests. 11 U.S.C. § 524(c).

(1977), *reh. den.* 430 U.S. 976, 97 S.Ct. 1670, 52 L.Ed.2d 372 (1977); *In re Vaughn*, 462 F.Supp. 1040 (N.D.Tex.1978), including that of contempt of court. *See*, Bankruptcy Rule 920. Under the scheme of the Bankruptcy Act, the court is given authority to make such orders, and enter such judgments, in addition to those specifically provided for in the Act, as are necessary for the enforcement of the statute. 11 U.S.C. § 11(15); *see, Seaboard Small Loan Corp. v. Ottinger*, 50 F.2d 856 (4th Cir. 1920). This is particularly true in light of the 1970 Amendment to the Bankruptcy Act, 11 U.S.C. § 35, which vested the Bankruptcy Court with exclusive jurisdiction over all dischargeability questions, *see In re Barlick*, BK–71–310 (D.R.I.1974), and authority to make all orders necessary to effectuate its determination. 11 U.S.C. § 35(c)(3).

The facts of this case demonstrate quite clearly that the plaintiff's refusal to return the bankrupt's wages, which were wrongfully attached to begin with, was expressly for the purpose of harassment and to aid in obtaining the reaffirmation of a debt which we hold is dischargeable. The effect of Public's conduct was to cause the bankrupt all of the expected problems which would normally flow from such acts, designed as here, to intimidate and otherwise trouble the victim. We conclude, therefore, that compensatory damages for the wrongful withholding of the funds in question should be assessed in the amount of $500.

■ Also, based on the facts in this case, we feel the matter is one which merits consideration of the assessment of punitive damages. Punitive damages may be awarded in the discretion of the court, *see, Northern v. McGraw–Edison Co.*, 542 F.2d 1336 (8th Cir. 1976), *cert. den.*, sub nom., *McGraw–Edison Co. v. Soper*, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1976); *Sherman v. McDermott*, 114 R.I. 107, 329 A.2d 195 (1974), where there has been conduct in bad faith. *See, Herreshof v. Tripp*, 15 R.I. 92, 23 A. 104 (1885), quoted in *Berberian v. New England Telephone and Telegraph Company*, 117 R.I. 629, 369 A.2d 1109, 1112 (1977). The type of conduct necessary for an award of punitive damages does not require malice or ill will toward the plaintiff, *see, Smith Devel. Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 308 A.2d 477, 480 (1973), but that the act be done intentionally and without just cause. *See, Northern v. McGraw–Edison Co., supra* at 1349.

Here, the intentional decision by Public Finance to withhold wages which were attached in violation of the automatic stay provisions of the Bankruptcy Act is precisely the type of conduct sought to be discouraged when the Bankruptcy Court was given the broad authority to protect bankrupts against overreaching by creditors. *See, generally*, 61 A.L.R.3rd 984. Therefore, punitive damages are awarded to the bankrupt in the amount of $2,000. *Gore v. Gorman's, Inc.*, 143 F.Supp. 9 (W.D.Mo.1956).

Finally, as Public was well aware, its exclusive remedy with respect to the question of enforcement of this debt was to file a complaint to determine dischargeability under § 17(a)(2), and to have that issue determined before this court. It is Public's extra–judicial efforts to effectuate the non-dischargeability of this debt, and its obstinate refusal to acknowledge the prohibitions of the Bankruptcy Act against this type of conduct, which required the defendant to file this counterclaim and to incur additional legal expenses.

This bad faith, vexatious, and willful conduct of the plaintiff, as described above, also seems to make this case an appropriate one for the assessment of attorney fees. *See, Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *In re Scanlon*, 4 B.R. 197 (Bkrtcy.E.D.Pa.1980); *In re Mainey*, 47 Amer.Bankr.L.J. 67 (D.R.I. 1972).

However, we feel constrained by the decision in *Cordeco Development Corp. v. Santiago Vasquez*, 539 F.2d 256 (1st Cir. 1976), *cert. den.*, 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976), in which the First Circuit held that "[s]ubject to the traditional 'judicially fashioned exceptions', to which Congress is deemed to have acquiesced, federal courts are not free to award fees to litigants except under the authority of a

statute." *Id.,* at 263, n.11. Noting the American common law rule that attorney's fees are not compensable damages, *Arcambel v. Wiseman,* 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796), the court questioned whether fee awards could be imposed for wrongful conduct in events leading to suit, despite recent inroads on the "American rule." *See e. g., Newman v. Alabama,* 522 F.2d 71, 80 (5th Cir. 1975); *Stolberg v. Members of Board of Trustees,* 474 F.2d 485, 490–91 (2d Cir. 1973). The award of fees, according to the First Circuit, is particularly inappropriate when punitive damages have also been awarded. "Traditionally, punitive damages have been considered a more precise measure of a defendant's wrongful conduct than an award of fees, and to the extent that an award of fees under the 'bad faith' exception is punitive, [an] award of both fees and punitive damages for conduct giving rise to the lawsuit constitutes double punishment for such action." *Cordeco Development Corp. supra,* at 263. (citations omitted) While that decision does not totally foreclose the possibility of awarding attorney's fees "in extraordinary circumstances and for dominating reasons of justice," this court is of the view that the present case does not meet that high standard.