Jeanne NICHOLSON,

v.

**Janet BUEHLER.**

**No. 91–428–Appeal.**

Supreme Court of Rhode Island.

July 10, 1992.

Herbert Katz, Pawtucket, for plaintiff.

Michael F. Horan, Pawtucket, for defendants.

## OPINION

KELLEHER, Justice.

In this civil action the defendant, Janet Buehler (Buehler), appeals from a judgment issued by a Superior Court justice awarding the plaintiff, Jeanne Nicholson (Nicholson), contract damages in the amount of $5,027 plus interest and costs. We affirm the judgment of the Superior Court.

In August 1975 the Ladies Professional Bowlers' Association (LPBA), an Ohio corporation of which Buehler was president, contracted with Nicholson for her public-relations services. At that time Nicholson worked and lived in New York City, and Buehler resided in Ohio. Nicholson commenced performance under the contract and began billing the LPBA for her services.

In 1977 Nicholson moved from New York City to Newport, Rhode Island, and continued her business with the LPBA from her new residence. Buehler testified that although she had addressed correspondence to Nicholson in Newport, she assumed Nicholson was vacationing there.

Later in 1977 Buehler joined forces with Roger Blaemire (Blaemire) to form a new women's professional bowling organization, the LPBA, doing business as the Women's Professional Bowling Association (WPBA). For the purposes of this opinion we shall refer to the new entity by its trade name WPBA. The WPBA became operative January 1, 1978, with Buehler as the executive director and Blaemire as the commissioner. Despite the merged identity Buehler's office remained in Ohio, and Blaemire worked in Chicago.

Although Buehler and Blaemire clearly divided some duties of the enterprise between their two offices, initially both offices handled public-relations work. Nicholson continued to undertake projects at

Buehler's instruction as she had before the merger. All communications between Nicholson and Buehler occurred through telephone conversations and mailings. Buehler maintains that she had never been physically within Rhode Island's borders until this trial.

On April 24, 1978, Buehler met with Blaemire and learned that Blaemire wanted to discontinue Nicholson's services as public-relations consultant for the WPBA. After the meeting Buehler discussed Blaemire's statement with Nicholson. Nicholson testified that Buehler told her that although she (Buehler) had to "go with" Blaemire, she would continue to retain Nicholson's services personally.

Following this change in the working relationship between Nicholson and Buehler, Nicholson became unclear regarding whom she should bill for her services. Nicholson testified that when she asked Buehler this question in July 1978, Buehler reaffirmed that she needed Nicholson's services and did not intend to proceed without Nicholson's support. Furthermore Nicholson testified that Buehler had indicated that Nicholson could no longer bill the organization and had stated, "Just send the bill," and when faced with the same billing inquiry the following month, Buehler had responded, "[A]ddress your bills to me, Janet Buehler, at WPBA." Nicholson then proceeded to bill Buehler in this manner beginning in July 1978, and she testified that she understood that from that time forward she was working directly for Buehler.

In March 1979 Buehler asked Nicholson to write a speech for her. At that point Nicholson was owed money for past services, but Buehler indicated that she would pay all amounts due. After delivering the speech to Buehler, Nicholson received three checks in late May 1979. The checks were drawn on Valley Bowl Lanes and Hall of Fame Lanes, with which Buehler was affiliated, and on Buehler personally. At one point Buehler wrote a check from the Valley Bowl Lanes to Nicholson in the amount of $1,500. In the fall of 1979 Buehler's accountant sent Nicholson a letter stating that the $1,500 had been a loan that had to be paid back. However, Nicholson testified that she had never requested a loan from Buehler. Buehler testified that as president of Valley Bowl Lanes, she had the authority to loan Nicholson $1,500. Buehler also testified that Valley Bowl Lanes took action to collect the money from Buehler and that she paid it back.

Nicholson testified that in the fall of 1979 Buehler had accumulated a debt of $6,684.24 and, when pressed for payment stated, "I will see what I can do about getting some money for you." Nicholson credited the $1,500 check against that amount due. In a meeting between Nicholson, Buehler, and Buehler's attorney in October 1979, Buehler acknowledged a debt to Nicholson (without reference to a specific dollar amount) but could not predict when she would be able to pay it. Nicholson contends that Buehler now owes her $5,027 plus interest.

On July 14, 1982, Nicholson filed a complaint in the Second Division District Court of Rhode Island against Buehler, seeking recovery of the unpaid fees. Buehler filed an answer raising the affirmative defense of lack of personal jurisdiction. In accordance with a stipulation agreed to by the parties the District Court judge issued judgment in favor of Nicholson on February 26, 1987, from which Buehler appealed to Newport County Superior Court for a de novo trial. On January 26, 1990, a jury-waived trial began in Newport Superior Court. The trial was continued on several occasions: first to February 14, 15 and 16, 1990, and then to March 16, 1990. The trial resumed on April 6, 1990, following the third continuance when, at the close of all evidence, Buehler moved to dismiss Nicholson's complaint on the basis of lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Superior Court Rules of Civil Procedure. The trial justice denied Buehler's motion and granted the last continuance. On May 18, 1990, the trial justice heard final arguments and entered judgment in Nicholson's favor for $5,027 plus $6,635.64 in interest. On June 4, 1990, Buehler filed her appeal to this court.

On appeal Buehler raises three issues. She first contends that her activities and communications with Nicholson did not constitute sufficient minimum contacts with the State of Rhode Island and that therefore the trial justice erred in denying her motion to dismiss based on lack of personal jurisdiction. We disagree.

An analysis of the law of personal jurisdiction begins with an examination of the statute that confers such jurisdiction. Rhode Island's long-arm statute, G.L.1956 (1985 Reenactment) § 9–5–33(a), provides that "every individual not a resident of this state * * * that shall have the necessary *minimum contacts* with the state of Rhode Island, shall be subject to the jurisdiction of the state of Rhode Island * * * in every case not contrary to the provisions of the constitution or laws of the United States." (Emphasis added.) In other words this court may exercise jurisdiction over persons up to federal constitutional due process limits as delineated by *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. *See McKenney v. Kenyon Piece Dye Works, Inc.*, 582 A.2d 107 (R.I.1990); *Bendick v. Picillo*, 525 A.2d 1310 (R.I.1987). Indeed, in enacting the long-arm statute, the General Assembly borrowed the all-important words "minimum contacts" from *International Shoe* in which the Court stated that a nonresident defendant must "have certain *minimum contacts* with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" (Emphasis added.) 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed. at 102.

In applying this standard, we must look to the facts of each particular case. *Roger Williams General Hospital v. Fall River Trust Co.*, 423 A.2d 1384, 1386 (R.I.1981)(citing *Conn v. ITT Aetna Finance Co.*, 105 R.I. 397, 252 A.2d 184 (1969)). In doing so, this court shall make a case-by-case determination in recognition of "developments in communication and transportation [that] have resulted in an increasing nationalization * * * and have increased the need for states to exercise jurisdiction over nonresidents." 423 A.2d at 1386.

■ This court recently announced: "This inquiry regarding minimum contacts turns on whether the cause of action arises out of the defendant's contacts with the forum. If a defendant's conduct does provide the basis for the litigation, all that need be shown for jurisdiction to be proper is a 'relationship among the defendant, the forum, and the litigation.'" *McKenney*, 582 A.2d at 108 (citing *Ben's Marine Sales v. Sleek Craft Boats*, 502 A.2d 808, 812 (R.I.1985), quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404, 411 (1984)). Thus we must employ a two-step analysis: first, we must determine whether the cause of action arises out of the defendant's contacts with Rhode Island; if we answer this question in the affirmative, we must then determine whether any relationship among the defendant, the forum, and the litigation exists.

■ The record indicates that Nicholson's suit does arise out of Buehler's contacts with Rhode Island. The trial justice found that Buehler had numerous contacts with Nicholson within the State of Rhode Island in the form of telephone calls and mailed correspondence. Buehler initiated many of these communications, and thus they did not result from the unilateral activity of Nicholson. *See State of Maryland Central Collection Unit v. Board of Regents for Education of the University of Rhode Island*, 529 A.2d 144, 151 (R.I. 1987). Moreover these contacts occurred over several years in furtherance of the business relationship between the parties.

■ The second step in the analysis involves an assessment of the relationship among Buehler, Rhode Island, and the litigation. In doing so, we subscribe to the trial justice's characterizations of Buehler's contacts with Rhode Island as part of a consistent stream of reciprocal activities. Furthermore we agree with the trial justice's description of Nicholson's public-relations services as a nontangible product that Buehler obtained through her contacts within the State of Rhode Island. Buehler

attempts to isolate numerous contacts, to claim that each taken alone does not satisfy the minimum-contacts requirement, and thereby to elude jurisdiction. We stress that the forum state must consider the cumulative effect of all such contacts in their aggregate. Only in this way shall the true quality and nature of the relationship of the defendant, the litigation, and the forum emerge. *See International Shoe Co.*, 326 U.S. at 319, 66 S.Ct. at 160, 90 L.Ed. at 103. Accordingly Buehler's contention that a single phone call or letter cannot alone satisfy the minimum-contacts requirement falls short since it ignores the cumulative effect of those contacts.

Despite Buehler's suggestion to the contrary we must consider her lack of physical presence within Rhode Island unpersuasive. Although physical presence within a forum may alone support the assertion of jurisdiction (sometimes referred to as "tag" jurisdiction), *Burnham v. Superior Court of California*, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990)(temporary presence within a state for activities unrelated to the suit supports jurisdiction over a nonresident defendant), it is well settled that physical presence within the forum is not necessary to support jurisdiction.

Buehler's contacts with Rhode Island evinced a systematic and continuous relationship by which she purposefully availed herself of the privilege of conducting activities within Rhode Island and invoked the benefits and protections of the laws of Rhode Island. *See Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283, 1298 (1958).

In reviewing a decision of a trial justice sitting without a jury, this court is limited to a determination of whether he or she misconceived or overlooked relevant evidence or was otherwise clearly wrong. *Proffitt v. Ricci*, 463 A.2d 514 (R.I.1983). Consequently we find no due-process violation in asserting jurisdiction over Buehler, and we therefore affirm the trial justice's denial of Buehler's motion to dismiss based on lack of personal jurisdiction.

Buehler next argues she is not personally liable to Nicholson for the alleged debt since Buehler acted as an agent for the WPBA. We disagree.

In support of her position Buehler cites *Cardente v. Maggiacomo Insurance Agency, Inc.*, 108 R.I. 71, 272 A.2d 155 (1971), in which we held that an agent acting on behalf of a disclosed principal is not personally liable to third parties for acts performed within the scope of the agent's authority. However, Buehler fails to recognize an exception to this so-called disclosed-principal rule. In an opinion issued three days after *Cardente*, we stated that "[w]hile an agent working for a known principal is *usually* not personally liable for acts done within the scope of his authority, he may either expressly or impliedly incur such personal liability." (Emphasis added.) *C.C. Plumb Mixes, Inc. v. Stone*, 108 R.I. 75, 76, 272 A.2d 152, 154 (1971)(citing *McCarthy v. Hughes*, 36 R.I. 66, 88 A. 984 (1913)). We note that liability incurred in this manner derives from an implied contractual obligation independent of the principal-agent relationship. 108 R.I. at 76, 272 A.2d at 154. Accordingly the issue raised in the case at bar is not whether Buehler otherwise acted as an agent of the WPBA but, with respect to the specific obligation disputed in the case at bar, whether the whole course of dealing between Nicholson and Buehler was such that an obligation to pay Nicholson could properly be implied therefrom. *See McCarthy*, 36 R.I. at 73, 88 A. at 987.

In determining whether Buehler either expressly or impliedly had undertaken a personal obligation to pay Nicholson for her services, the trial justice found several aspects of the evidence and testimony persuasive. First, the trial justice found that Nicholson, who had become aware of Blaemire's desire to discontinue her services, was "no fool" and rendered her services in reliance on something Buehler said during the summer of 1978. Moreover, the trial justice found that the payments of portions of the obligation owed Nicholson out of funds of other entities controlled by Buehler and unrelated to the WPBA tend to support Nicholson's contention that Buehler was personally liable. Finally a letter

dated December 27, 1979, from Buehler to Nicholson in which Buehler disclosed personal financial problems, persuaded the trial justice that Buehler had undertaken a personal obligation.

We agree with the trial justice that the above events evinced a course of dealing between Nicholson and Buehler from which an express or implied promise on Buehler's part could properly be implied. Moreover, the trial justice was not clearly wrong in finding Buehler personally liable. Accordingly we affirm the judgment against Buehler.

■■■ Last, Buehler contends that the trial justice abused his discretion by continuing the trial four times over a four-month period, causing her to make five trips from Canton, Ohio, to Newport, Rhode Island, in violation of her constitutional rights to due process and a fair trial. We disagree.

A trial justice possesses wide discretion in administering a trial. "[T]he management of a trial calendar is among the most difficult of all judicial assignments. * * * Consequently the widest discretion must be given to calendar justices and trial justices in carrying out this enormously difficult function whose balance may be upset on any given occasion by a variety of unforeseeable factors." *Boucher v. Galvin*, 571 A.2d 35, 37 (R.I.1990). Also, "[t]here is no question that under Rhode Island procedural rules, a continuance may be granted or refused in the discretion of the [trial] justice." *Id.*

In the case at bar the record reveals that the trial justice granted each of the four continuances for sound reasons. After testimony began on January 26, 1990, the trial justice granted the first continuance until February 14, the next day on which the courtroom was available and both parties could attend. Following testimony on February 14, 15, and 16, the trial justice granted the second continuance until March 16 since the court was in the process of moving to a new building. On March 16 the trial justice granted a third continuance until April 16 since he was unavailable because of another trial and a seminar. The testimony ended on April 6, and the trial

justice granted the final continuance until May 18 for argument and decision. Although Buehler undoubtedly would have preferred to have made only one trip to Newport, the mere inconvenience of Buehler does not rise to the level of a violation of her rights to due process and a fair trial. In light of the wide discretion afforded trial justices in this area, we are of the opinion no abuse of discretion occurred in the instant controversy.

Buehler's appeal is denied and dismissed, and the judgment appealed from is affirmed.

FAY, C.J., did not participate.