**UST CORPORATION**

v.

**GENERAL ROAD TRUCKING CORP. et al.**

**No. 99–279–Appeal.**

Supreme Court of Rhode Island.

Nov. 5, 2001.

---

Elizabeth McDonough Noonan, Providence, for Plaintiff.

Timothy D. O'Hara, East Providence, for Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

Here, we sift through the rubble of a joint venture to remediate petroleum-contaminated soil. We also trace the predictable plume of finger pointing that seeped from the site of the venture's collapse. The plaintiff, UST Corporation (UST), appeals from a Superior Court judgment that awarded UST $151,248 in damages against the defendant, Coventry Sand & Gravel, Inc. (CS & G, Inc.) for breach of contract. The judgment also awarded CS & G, Inc. $47,000 in damages on CS & G, Inc.'s counterclaim. On appeal, UST objects to the trial justice's failure to include its pro-

jected future lost profits in the damages award. It also challenges the trial justice's failure to hold liable the defendants, General Road Trucking, Corp. (GRT) and Joseph D. Anthony (Anthony), who was a principal in both CS & G, Inc. and GRT, for their role in causing the joint venture to implode. For the reasons processed below, we affirm in part and reverse in part.

### Facts and Travel

After a nonjury trial, the trial justice issued a written decision that included certain findings of fact, the pertinent portions of which, together with certain other evidence in the record, we recap here. Robert W. Mancini (Mancini) created UST in 1986 to engage in the business of remediating petroleum-contaminated soil. That same year, Mancini, as president of UST, began discussions with Anthony, who was president and half owner of GRT, d/b/a Coventry Sand & Gravel (CS & G), about the possibility of entering into a joint venture to remove, treat, and dispose of petroleum-contaminated soil. Under the proposed arrangement, UST would provide the technical expertise, management, and pre-production processing of the contaminated soil. CS & G, Inc., which operated a processing plant on land owned by Anthony, which he in turn leased to GRT, would provide the labor and equipment necessary to the treatment operation.

In July 1987, Mancini prepared and signed on behalf of UST a so-called Exclusive Management Agreement (agreement) with CS & G, Inc. Anthony signed the agreement on behalf of CS & G, Inc., although he erroneously did so in the capacity of CS & G, Inc.'s president.[1] The agreement described the respective re-

---

1. Although Anthony was the president and controlling owner of GRT, he did not become the president of CS & G, Inc. until 1993. Until then he was not even a corporate officer of CS & G, Inc. Nevertheless, according to Anthony's son, James, who was a corporate officer of CS & G, Inc. since its creation, Anthony was acting with full authority to bind CS & G, Inc. when he entered into the agreement.

sponsibilities of the parties and established a payment schedule whereby the joint venture's revenues would be split between UST (40 percent) and CS & G, Inc. (60 percent).

In April 1988, Mancini prepared a Petroleum Contaminated Soil, Solid Waste Management Facility License Application (license application) and submitted it to the Rhode Island Department of Environmental Management (DEM). The joint venture needed this license to engage in the process of remediating contaminated soil. At the instruction of Anthony's and GRT's attorney, Mancini identified the license applicant as GRT d/b/a CS & G. Because of problems at the plant that were unrelated to the joint venture, DEM did not issue the license until July 1990. For unknown reasons, however, DEM eventually issued the license to CS & G, Inc. rather than to GRT d/b/a CS & G.[2] With this license in hand, the joint venture began to operate in October 1990.

During the joint venture's brief existence, UST collected the fees generated from customers who provided it with contaminated soil for processing. Per the agreement, UST would retain its 40 percent share, and then distribute CS & G, Inc.'s 60 percent share. Although the agreement called for CS & G, Inc. to receive its share of the joint venture's proceeds, it never actually did so. Apparently at Anthony's direction, UST issued checks to a payee called Coventry Paving Corporation, which Anthony acknowledged was merely a "d/b/a" for GRT. But regardless of what name UST placed on the checks, GRT eventually deposited all of CS & G, Inc.'s 60 percent share of the joint venture's revenues into a GRT bank account. Although both parties had high hopes for the long-term profitability of this enterprise, it lasted only three months, blowing apart after CS & G, Inc. refused to share the fees it received for having the processing plant accept deliveries of contaminated soil from a company named Taraco.

In January 1991, Anthony entered into discussions with Taraco about the venture's accepting deliveries of its contaminated soil for processing. Anthony insisted, and the trial justice so found, that he had talked with Mancini about the plant's accepting these shipments before it actually did so. Furthermore, Anthony testified, and the trial justice found, that Mancini was aware of these shipments from Taraco before they occurred, consented to them, and was worried only about Taraco's paying for the processing services it would receive. Mancini, on the other hand, vehemently denied consenting to the shipments. In fact, so he testified, he attempted to ensure that the plant would not accept the Taraco shipments because he feared that these deliveries would jeopardize CS & G, Inc.'s DEM license by causing the plant to exceed the maximum amount of contaminated soil specified in the DEM license for this site.[3] Indeed, Mancini asserted, he was not aware that Taraco had delivered contaminated soil to the plant until a week after it had done so. The trial justice, however, did not believe Mancini's testimony on this point; instead, he credited Anthony's version.

---

**2.** Although the application listed GRT d/b/a CS & G as the applicant, DEM in fact issued the license to CS & G, Inc. The record does not explain why DEM issued the license to CS & G, Inc., rather than to the named applicant.

**3.** The DEM license provided that no more than 1,700 tons of contaminated material could be on the site at any one time. Mancini testified that after Taraco delivered its soil, at least 2,000 tons of contaminated soil were present on site. After CS & G, Inc. arranged for these shipments and then refused to share the Taraco revenues with UST, Mancini reported this violation to DEM.

In any event, after the plant received the Taraco shipments, Taraco paid CS & G, Inc. for the processing services but CS & G, Inc. failed to distribute any share of this revenue to UST. Thereafter, Mancini informed DEM that he believed CS & G, Inc. had violated the terms of its license. At this point communications between the joint venturers completely broke down. Ultimately, DEM revoked the license, sounding the death knell for the already troubled venture. Nevertheless, although Taraco had paid CS & G, Inc. $378,120 in fees for the processing services it received, CS & G, Inc. never distributed a 40 percent share of that payment to UST.

Eventually, UST filed suit against GRT, CS & G, Inc., and Anthony for breach of contract, negligence, and tortious interference with contract. Before trial, the Superior Court granted summary judgment on CS & G, Inc.'s liability for breach of contract because it had failed to distribute to UST its 40 percent share of the revenue it had obtained from the Taraco shipments. CS & G, Inc. counterclaimed for $47,000 in payments that UST had withheld from revenues it had received from other joint-venture activities. But after hearing the evidence, the trial justice ruled that UST had failed to prove GRT's or Anthony's liability on any of the claims asserted against them. Accordingly, the court entered judgment for defendants on these claims, for UST on its breach-of-contract claim against CS & G, Inc., and for CS & G, Inc. on its counterclaim.

UST also had sought to recover its share of the joint venture's estimated future lost profits. In support of this aspect of its damage claim, UST presented expert testimony. But the trial justice determined that UST's evidence was based largely on highly speculative and unsupported assumptions. For example, UST's expert premised many of his lost-profit projections on a single week of operating data from the joint venture. For the reasons we discuss below, the trial justice was entitled to conclude that this one week of operating data was unrepresentative of the venture's three months of operations, let alone its future profitability. There also was a dispute about the actual processing capacity of the plant, with the trial justice finally concluding that, based upon Anthony's testimony, the plant would process many less tons per hour than UST had projected in its damage calculations. Ultimately, the trial justice ruled that UST had submitted insufficient evidence to allow a reasonably certain determination of future lost profits.

On appeal, UST has marshaled four specifications of alleged error for our review.[4] First, it argues that Anthony should have been held personally liable for tortious interference with contract when he procured the Taraco deliveries to the plant in violation of the joint-venture agreement. Second, UST contends, the trial justice erred when he found that Anthony personally owed no duty to UST, and thus was not liable to UST for negligence in connection with acceptance of the Taraco shipments. Third, it suggests the trial justice erred in finding that GRT was not liable for breach of contract because GRT was not only CS & G, Inc.'s alter ego, but also it had ratified the agreement by accepting its benefits and depositing checks from the venture into its bank account. Fourth, UST maintains the trial justice erred in ruling that it was not entitled to an award of future lost profits as part of the damages resulting from CS & G, Inc.'s breach of contract.

---

**4.** Although UST's brief refers to only three specifications of error, we treat separately the issues of Anthony's alleged tortious interference with contract and his alleged negligence.

## Standard of Review

■ It is well settled that this Court will not disturb the findings of a trial justice sitting without a jury "unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties." *McFarland v. Brier*, 769 A.2d 605, 610 (R.I.2001) (quoting *Paradis v. Heritage Loan and Investment Co.*, 701 A.2d 812, 813 (R.I.1997)). We apply this deferential standard to the case before us.

## Discussion

### I

### Tortious Interference with Contract

■ To prevail on a claim alleging tortious interference with contract, a plaintiff must show "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his [her, or its] intentional interference; and (4) damages resulting therefrom." *Belliveau Building Corp. v. O'Coin*, 763 A.2d 622, 627 (R.I. 2000) (quoting *Smith Development Corp. v. Bilow Enterprises, Inc.*, 112 R.I. 203, 211, 308 A.2d 477, 482 (1973)). After the plaintiff establishes these prima facie elements, "[t]he burden of proving sufficient justification for the interference shifts to the defendant." *Id.* To demonstrate intentional interference, a claimant need not show actual malice or ill will. Legal malice, " 'an intent to do harm without justification,' " is sufficient. *Jolicoeur Furniture Co. v. Baldelli*, 653 A.2d 740, 753 (R.I.

1995). See *also Mesolella v. City of Providence*, 508 A.2d 661, 669–70 (R.I.1986). To prevail, then, the plaintiff must prove that, ultimately, the defendant acted "without justification" or for an "improper" purpose. *Belliveau*, 763 A.2d at 628 (citing W. Page Keeton et. al., *Prosser & Keeton on the Law of Torts* ch. 24, § 129 at 978–79 (5th ed.1984)).

■ Many factors are instructive in determining whether an alleged interference with contract occurred without justification or was otherwise improper. These include the nature of the actor's conduct, the interests of the party with whom the actor's conduct interferes, and the relations between the parties. Restatement (Second) *Torts* § 767 (1979).[5] Because the application of these factors is necessarily fact-specific, their utility and relevance in determining justification will vary on a case-by-case basis.

■ In this case, the justification for Anthony's conduct in dealing with Taraco turned on whether the joint venturers had agreed to accept shipments of contaminated soil from Taraco under the conditions and in the manner that they later occurred, notwithstanding that these arrangements were contrary in various respects to the agreement between the joint venturers. At trial, the court heard conflicting testimony about UST's advance knowledge of, acquiescence in, and involvement with the Taraco shipments. Mancini testified that he had a conversation with Anthony at some point concerning the delivery of the Taraco shipments, but that

---

**5.** The Restatement (Second) *Torts* § 767 (1979) lists seven factors that may be considered in determining the appropriateness of interference, but not all are relevant to the case at bar. The seven factors are "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."

nothing ever was firmly established or agreed upon. Mancini also testified that he was unaware that the Taraco material was being shipped to the plant without his approval. He said that it was not until January 28, 1991, that an employee of GRT informed him that the plant had accepted deliveries from Taraco. Anthony testified that he had a conversation with Mancini in late December 1990 in which they discussed the Taraco shipments, and that Mancini never objected to them. Moreover, Anthony testified that he did not enter into the agreement with Taraco until after speaking with Mancini. This conflicting evidence presented a question of fact and credibility to be resolved by the trial justice.

Ultimately, the trial justice determined that Anthony had not acted with legal malice in dealing with Taraco. Although not applying the restatement factors explicitly, the trial justice found that Anthony had consulted with Mancini about the proposed shipments from Taraco, that Mancini never objected to the shipments, and that Mancini's only concern with the Taraco shipments was obtaining payment from Taraco. Although the evidence was in conflict, we cannot say that the findings of the trial justice were clearly erroneous, or that he misconceived or overlooked any relevant evidence.

The trial justice's findings also comport with the Restatement principles in determining whether an actor has interfered intentionally with a contract. Under the trial justice's view of the facts, Anthony's actions in dealing with Taraco were justified because he cleared these shipments with Mancini before accepting them and because he did not intend to throw a monkey wrench into the venture's operations when he arranged for this business. Given the trial justice's findings of fact and determinations of credibility, we cannot rule

that Anthony improperly interfered with the agreement, even though his dealings with Taraco did not comport with how the agreement was suppose to work and even though CS & G, Inc.'s failure to share the proceeds of that business with UST proximately caused the venture's demise. The trial justice concluded that, given Mancini's knowledge of and consent to the Taraco shipments, the joint venture ultimately collapsed after the plant had accepted these shipments because of the parties' mutual distrust that arose in connection with CS & G, Inc.'s failure to distribute UST's share of the Taraco processing fees.

## II

### Negligence

■ UST's next argument is that Anthony should be held personally liable for the Taraco debacle that resulted in DEM's revoking CS & G, Inc.'s license. UST's claim is that Anthony's negligence in dealing with Taraco caused DEM to revoke the license. For the court to hold Anthony liable for negligence, UST had to show that Anthony (1) personally owed a duty to UST; (2) that he breached that duty; (3) that the breach proximately caused UST's injuries; and (4) that UST suffered damages as a result of the breach. *See Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 466 (R.I.1996).

■ As we view the record, there is no evidence to support the existence of any duty running from Anthony to UST. Although Anthony was intimately involved with the creation of the agreement, with obtaining the DEM license, and with the Taraco shipment, his involvement was always, as the trial justice found, as an agent for either CS & G, Inc. or GRT, or for both of them. In these circumstances, it has long been settled in Rhode Island that "an agent acting on behalf of a disclosed

principal is not personally liable to third parties for acts performed within the scope of the agent's authority." *Nicholson v. Buehler*, 612 A.2d 693, 697 (R.I.1992) (citing *Cardente v. Maggiacomo Insurance Agency, Inc.*, 108 R.I. 71, 272 A.2d 155 (1971)). Although there is some evidence that Mancini may have believed he was dealing with GRT d/b/a CS & G, as well as CS & G, Inc., the record is devoid of any evidence suggesting that Anthony was acting in a personal capacity when he signed the agreement, applied for the license, arranged for the Taraco shipments, or decided not to distribute the Taraco fees to UST. On the contrary, he was acting within his authority on behalf of the corporate entities he represented. Therefore, UST's argument fails with respect to Anthony's alleged personal negligence. Indeed, but for CS & G, Inc.'s intervening breach of contract in refusing to distribute the Taraco revenues as per the agreement, UST and Mancini might have been as culpable as Anthony in causing the venture's ultimate demise—especially given the trial justice's finding of Mancini's knowledge of and consent to the Taraco shipments, let alone his whistleblowing to DEM about CS & G, Inc.'s license violations that arose after it accepted these shipments.

Finally, UST's argument that Anthony personally owed UST a duty to abide by the terms of the agreement based upon his ownership of the real property where the plant was situated is unpersuasive, given the trial justice's findings about UST's and Mancini's consent to the Taraco shipments. Thus, nothing Anthony did in his capacity as the property owner breached any duty he owed to UST.

## III

### GRT's Liability for Breach of Contract

■ UST's third, and most persuasive, argument is that the trial justice erred in failing to find GRT liable for breach of contract based upon its ratification of the agreement and its alter ego status vis-à-vis CS & G, Inc. Although the trial justice correctly noted that GRT was not a named signatory to the contract, that fact alone should not have ended the court's inquiry into GRT's potential liability for breach of contract. We have recognized on other occasions that a principal, with full knowledge of the facts, may ratify the actions of an agent when the principal accepts a benefit it otherwise would have no right to retain. *Newport Oil Corp. v. Viti Bros., Inc.*, 454 A.2d 706, 708 (R.I.1983) (citing *Kesselman v. Mid–States Freight Lines, Inc.*, 78 R.I. 518, 520, 82 A.2d 881, 882 (1951)). The general rule set forth in the Restatement of Agency is that "[t]he receipt by a purported principal, with knowledge of the facts, of something to which he would not be entitled unless an act purported to be done for him were affirmed, and to which he makes no claim except through such act, constitutes an affirmance unless at the time of such receipt he repudiates the act." Restatement (Second) *Agency* § 98 (1958). Such ratification by the principal may be demonstrated by conduct "justifiable only if there is ratification." *Newport Oil Corp.*, 454 A.2d at 708 (citing Restatement (Second) *Agency* § 93 at 240 (1958)). Here, UST submitted sufficient evidence to support a finding that GRT in fact accepted all the financial benefits from the joint venture, and therefore ratified the agreement.

■ There is no question but that Anthony was the controlling owner of GRT, and that he was authorized to act on its behalf. In addition, he was not only a 50 percent owner (with GRT) and principal of CS & G, Inc., but also he personally owned the real estate on which the joint venture operated the soil-processing plant. Moreover, the license application that Mancini

submitted to DEM listed GRT d/b/a CS & G as the actual applicant for the license. There was also credible evidence that Mancini believed that Anthony was acting on GRT's behalf. But the critical piece of evidence to indicate ratification by GRT of the agreement was that all of the joint-venture's proceeds earmarked for CS & G, Inc. under the agreement nevertheless ended up in GRT's bank account.

Customers who provided contaminated soil to the plant for processing paid UST for the services they received. But UST in turn would pay out CS & G, Inc.'s 60 percent share of the revenue to GRT directly or to Coventry Paving Corporation, GRT's "d/b/a." In either event, the money ultimately would find its way into GRT's bank account.[6] Thus, UST endorsed some checks to a payee called Coventry Paving Corporation, but even those checks were ultimately deposited into GRT's bank account. Significantly, no checks ever were made payable either to CS & G or CS & G, Inc. Given this evidence, it was clear that GRT had garnered all of CS & G, Inc.'s share of the monetary benefit from the agreement. Indeed, it appears that not even one check for the venture's fees (except perhaps the one received from Taraco) was ever made payable to CS & G, Inc., and that 60 percent of all of the proceeds from the venture ultimately were deposited into GRT's bank account.

In sum, because GRT obtained the lion's share of the monetary benefit from the joint-venture agreement entered into by its agent, CS & G, Inc., and because GRT's principal, Anthony, was also the principal of CS & G, Inc., GRT should not have been allowed to evade its obligation to share the proceeds from the Taraco shipments with UST merely because it was not a signatory to the agreement.

In addition, the facts of this case show that corporate formalities were ignored to such an extent as would justify piercing the corporate veil of CS & G, Inc. and holding GRT liable for the actions of CS & G, Inc. as its alter ego. Although courts generally decline to pierce the veils that separate one company from another and from the individuals that own them, *Doe v. Gelineau*, 732 A.2d 43 (R.I.1999), we have recognized that there are circumstances when, in the interest of justice, it is appropriate to do so. *E.g., McFarland v. Brier*, 769 A.2d 605 (R.I.2001). To be sure, the mere existence of a parent-subsidiary relationship between two corporations is insufficient to hold the parent responsible for all breaches of contract of the subsidiary. *Miller v. Dixon Industries Corp.*, 513 A.2d 597, 604 (R.I.1986) (citing *Parrillo v. Giroux Co.*, 426 A.2d 1313, 1321 (R.I.1981)). But this is only the general rule. If the circumstances of the case show that a parent-subsidiary relationship existed and it was "demonstrated that the parent dominated the finances, policies, and practices of the subsidiary," then a court should pierce the corporate veil and hold the parent liable as an alter ego for the subsidiary's breach of contract. *Gelineau*, 732 A.2d at 48 (quoting *Miller*, 513 A.2d at 604). Moreover, if the "totality of circumstances surrounding their [parent-subsidiary] relationship indicates that one of the corporations 'is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct [of some one or

---

**6.** Thirteen checks were introduced into evidence at trial. The first two checks were drawn on a fictitious third company, CS & G Reclamation, that Mancini and Anthony were going to create so both would have the authority to sign checks. No such corporation, however, was ever created, and in all instances GRT wound up depositing CS & G, Inc.'s share of the money into GRT's bank account.

more other entities],'" then a court should pierce the corporate veil and hold these other entities liable. *Gelineau,* 732 A.2d at 48 (quoting *Vucci v. Meyers Brothers Parking System, Inc.,* 494 A.2d 530, 536 (R.I.1985)).

The facts introduced into evidence at trial showed that Anthony signed the agreement in his capacity as president of CS & G, Inc., but that he was not actually a corporate officer of CS & G, Inc. until 1993, well after the fact.[7] The defendants attempted to skirt this issue by the testimony of Anthony's son, James, who said that Anthony was at all times acting with the authority of CS & G, Inc. But according to the license application, Anthony was acting on behalf of GRT d/b/a CS & G. This information was confirmed by Anthony's attorney at the time. Add to this already intertwined corporate structure the fact that all money due and owing CS & G, Inc. under the agreement was in fact deposited into the account of GRT and a clearer picture begins to emerge.[8] GRT, through its agent CS & G, Inc., entered into the agreement. That contract purported to be on behalf of, and for the benefit of CS & G, Inc. In reality, however, CS & G, Inc. was a mere conduit while GRT, a 50 percent owner of CS & G, Inc., was the responsible entity. Through Anthony, it wholly controlled the policies and practices of CS & G, Inc. and it also so controlled the finances of CS & G, Inc. that all payments from the venture that should have been made to CS & G, Inc. were funneled into GRT's bank account. Thus, GRT, through Anthony and CS & G, Inc., ignored the separate corporate existence of the entities involved and simply grabbed all of the money thrown off by the joint venture for no known consideration. Under these circumstances, it would work an injustice not to hold GRT jointly responsible for CS & G, Inc.'s breach of contract in failing to share the Taraco revenues with UST.

We therefore hold that the trial justice misconceived and overlooked the above-discussed evidence when he ruled that GRT was not a party to the contract and, thus, was not liable for its breach. Accordingly, we vacate this aspect of the judgment. Because the court entered summary judgment for UST on CS & G, Inc.'s breach of contract, and those same actions were equally attributable to GRT as the real beneficiary of the agreement, we hold that the trial justice's finding of damages in the amount of $151,248 is applicable to GRT as well as to CS & G, Inc.

## IV

### Future Lost Profits

UST's final contention is that the trial justice erred in not awarding future lost profits as damages for CS & G, Inc.'s breach of contract.[9] We have recognized that when a defendant wrongfully interrupts a business venture, it may be appropriate for the affected party to recover future lost profits as part of its damages. *Troutbrook Farm, Inc. v. DeWitt,* 611 A.2d 820, 824 (R.I.1992) (citing *Abbey Medical/ Abbey Rents, Inc. v. Mignacca,* 471 A.2d 189, 195 (R.I.1984)). To recover future lost profits, however, the "loss must be established with reasonable certainty." *Smith Development Corp. v. Bilow Enter-*

---

7. The agreement was signed in July 1987.

8. In addition, it should be noted that the trial justice held as a factual matter that Anthony and GRT owned CS & G, Inc., a finding that is not challenged on appeal.

9. The Superior Court entered summary judgment against CS & G, Inc. based upon its liability for breach of contract, but it left the determination of damages for trial.

*prises, Inc.,* 112 R.I. 203, 212, 308 A.2d 477, 482 (1973) (citing McCormick, *Damages* § 26 at 99–100 (1935)). Therefore, the inclusion of future lost profits in a damages award turns on whether they can be proven with "reasonable certainty."

■ Reasonably certain future lost profits are defined as damages that are not based "wholly upon speculation and conjecture." 22 Am.Jur.2d *Damages* § 626 (1988). Although the projected existence of future lost profits must be reasonably certain, "[w]e do not require mathematical certainty." *Abbey Medical,* 471 A.2d at 195 (citing *Zuromski v. Lukaszek,* 67 R.I. 66, 69, 20 A.2d 685, 686 (1941)). One of the best ways of establishing reasonably certain future lost profits—though it is scarcely the only way—is to use the operational history of the enterprise for which future lost profits are being sought, or a representative portion thereof, as a basis for predicting future lost profits. In the case at bar, however, the joint venture had only been in business for approximately three months when the breach of contract occurred; thereafter, communications between the parties ceased, DEM revoked its license, and the venture abruptly ended.

In these circumstances, some courts have applied a rigid so-called "new business rule" to bar the award of future lost profits to entities lacking a significant history of operating profits. That rule holds that "evidence of expected profits from a new business [are] too speculative, uncertain, and remote * * * and [do] not meet the legal standard of reasonable certainty." 22 Am.Jur.2d *Damages* § 627 (1988). Although the "new business rule" is too

draconian to be applied in all new-business situations, this case illustrates the difficulty of projecting "reasonably certain" future lost profits when the business in question was only in existence for a relatively short time (about three months). Moreover, many of the UST damage expert's projections of future lost profits were based on only one week of the available operating data. He also relied upon what the trial justice found to be "unsupported and speculative assumptions."

■ The trial justice determined that, in projecting future lost profits, UST had assumed that the parties would make certain equipment upgrades costing approximately $750,000. Although the plant needed these upgrades to comply with DEM regulations and to renew its DEM license in July 1991, whether the parties would have decided to invest such a significant sum was speculative at best. Moreover, the trial justice heard conflicting testimony concerning the processing plant's effective operating capacity. He ultimately found that its capacity was only twenty-five tons per hour.[10] Although UST makes much of the fact that its expert confidently assured the court that the actual capacity was closer to 215 tons per hour, we have no basis to overturn the trial justice's findings that Anthony's testimony on this point was more persuasive.[11] Anthony testified from his personal experience that the equipment could only process twenty-five tons per hour, and the trial justice was not clearly in error when he credited this testimony and so found.

In addition, UST's expert based his projections of future lost profits on state-

---

**10.** Anthony based his estimate of twenty-five tons per hour capacity on his personal experience with the equipment.

**11.** As the trial justice noted, UST's expert never actually inspected the machinery. The

plant-capacity conflict between plaintiff's expert and Anthony's testimony was a question of fact and credibility for the trial justice's determination.

created lists of contaminated sites in this region that were potentially in need of remediation. UST did not, however, offer any evidence that the joint venture actually had entered into, or would have been able to obtain, remediation contracts with any of those site owners. Mancini's mere trumpeting of his extensive business contacts, coupled with the introduction into evidence of government-produced lists of contaminated sites, was insufficient to allow a calculation of future lost profits to occur with any reasonable certainty—at least beyond July 1991, when the plant's DEM license was scheduled to expire absent a $750,000 capital-equipment upgrade. The trial justice took all the above evidence into account when he made his findings and concluded that UST had not established future lost profits beyond July 1991 with the requisite degree of reasonable certainty, and we conclude that he did not commit reversible error in doing so.

Nevertheless, given the ongoing and successful nature of this business when the breach of contract occurred, we believe that there was sufficient evidence to indicate that, but for the breach, the joint venture would have continued to generate profits at least until July 1991 (when the DEM license would have expired without a significant additional investment). Therefore, we remand this case for a new trial on damages to determine the future lost profits that UST was entitled to obtain as damages for the period from late January 1991, to July 1991 (when the license was scheduled to expire), based upon the effective plant operating capacity of twenty-five tons per hour. In allowing a recovery for these future lost profits, however, we share the trial justice's concern about selecting reasonable bases for UST's projections. It appears from the record that UST's expert based many of his projections on only one week of operating data from the available three months when the venture was in existence. When dealing with a venture that existed for only three months, using only one week of data for profit projections simply does not rise to the requisite level of reasonable certainty necessary to recover future lost profits. On retrial, a longer and more representative period of operating history should be selected.

Furthermore, although the nature of this soil-reclamation business may be somewhat informal, such that written contracts with customers would not be customary, on remand UST should be allowed to demonstrate the existence of any ongoing business relationships with owners of contaminated sites that more likely than not would have generated future business and profits for the venture through the expiration of the license in July 1991. Moreover, UST should be allowed to revise its projections using operating data concerning its actual revenues and expenses covering a longer and more representative period of the venture's operation than the one week it selected at the first trial. After taking into account all of the above, if UST demonstrates the existence of future lost profits for the period from the breach through the date specified for the license to expire, then it will be entitled to recover such future lost profits from CS & G, Inc., as well as from GRT.

## Conclusion

All that abides from this once promising and profitable joint venture are the unremediated piles of contaminated soil that were once its stock in trade.

"Nothing beside remains. Round the decay Of that colossal wreck, boundless and bare The lone and level sands

stretch far away!"[12]

For the reasons stated above, UST's appeal is sustained in part and denied in part. We vacate that portion of the judgment below that absolved GRT from liability for breach of contract, affirm the rest of the judgment, but remand the papers in this case to the Superior Court for a new trial on damages for UST's future lost profits during the period from late January 1991, through the license expiration date in July 1991, assuming an effective plant operating capacity of twenty-five tons per hour, as found by the trial justice.

**12.** Percy Bysshe Shelley, *Ozymandias,* in *The New Oxford Book of English Verse, 1250–1950,* 580 (Helen Gardner ed.1972).