DECISION
This matter is before the Court for decision on the Motion of Defendants — Metropolitan Property and Casualty Insurance Company ("Metropolitan"), Amica Mutual Insurance Company, and Amica Property and Casualty Insurance Company ("Amica"), and Allstate Insurance Company, Inc. ("Allstate") (collectively, "Defendants") — for Partial Summary Judgment on Counts I, II, III, V, and VI of the Second Amended Complaint of Plaintiff David F. Miller ("Plaintiff" or "Mr. Miller") pursuant to Rule 56(b) of Rhode Island Superior Court Rules of Civil Procedure. Additionally, before the Court is the decision on the Motion of Defendants — Metropolitan and Amica — for Partial Summary Judgment on Count IV of Plaintiff's Second Amended Complaint pursuant to Rule 56(b) of the Rhode Island Superior Court Rules of Civil Procedure is before the Court. *Page 2 
 I Facts and Travel
This action arises out of alleged acts of insurance fraud committed by Plaintiff and the ensuing criminal investigation and prosecution of such. In 2001, the Rhode Island State Police ("RISP") undertook an investigation of Plaintiff's auto body shop. According to the police narrative of Detective Kershaw, representatives of "MetLife"[1] requested a meeting to discuss alleged insurance fraud. Apparently, Plaintiff had been inflating costs of repairs and recovering excess money from car insurance claims. Following this and other complaints, [2] RISP initiated an undercover investigation of Plaintiff.
During the first leg of the investigation, Defendant Metropolitan provided RISP with a vehicle that was taken into Plaintiff's auto body shop for repairs by an undercover officer. See Doucet Aff. 1. According to the affidavit of Detective Doucet, this initial `sting' resulted in Plaintiff charging for fraudulent repairs in excess of $1,100. Id. at 3. Later, another vehicle was supplied by Defendant Amica for an additional `sting.' Id.
Again, this vehicle underwent $1,050 worth of fraudulent repairs by Plaintiff. Id. at 5. Following these investigations, Mr. Miller was arrested by the RISP and charged with Insurance Fraud and Attempting to Obtain Money under False Pretenses. See
Pl.'s Ex. G at 7.
Thereafter, by March 28, 2005, the case against Miller was dismissed "due to evidentiary and proof issues." See Pl.'s Ex. B. The dismissal was conditioned upon *Page 3 
Plaintiff's payment of restitution, relinquishment of or transfer of his Department of Business Regulation auto body license, and execution of a general liability release. Id. The release, signed on March 29, 2005, relinquished all Defendants from any causes of action against them arising from the criminal case against Plaintiff. See Pl.'s Ex. F.
Plaintiffs eight-count[3] Second Amended Complaint, alleges Tortious Interference with Contractual Relations (Count I), Tortious Interference with Prospective Contractual Relations (Count II), Malicious Prosecution (Count III), Abuse of Process (Count IV), Continued Tortious Interference with Contractual Relations (Count V), Continued Tortuous Interference with Prospective Contractual Relations (Count VI), Violation of the Rhode Island Deceptive Trade Practices Act (Count VI) [sic], and Punitive Damages (Count VII). See Pls.'Sec.Am. Compl. The Complaint alleges that presumably because Miller was publicly pushing for change in the Rhode Island legislation regarding auto body dealers — specifically the legislation regarding labor rates used by the auto body repair shops, as well as the methods used and amounts of monies paid by insurance companies with regard to auto body work — Defendants began steering customers away from Plaintiff.Id. at 3-4. Allegedly, Defendants represented to their insured that Plaintiff overcharged for work performed and informed the same that "they did not warranty said work." Id. at 4. The Complaint insists that Defendants initiated audits and investigations that turned up no wrongdoing on the part of Plaintiff.
Moreover, according to Plaintiff, Defendants made false allegations about Plaintiff's business practices and work practices, including his improper estimate and repair methods, to the RISP.Id. at 5. Plaintiff avers that the RISP began to investigate *Page 4 
Plaintiff as a result of these false allegations. Furthermore, Plaintiff contends that the RISP's investigation was financed by Defendants and directly resulted in the commencement of the prosecution and subsequent arrest of Plaintiff. Id. Such actions were allegedly taken in an effort to put Plaintiff out of business and to coerce their insured to use preferred auto body shops, which operate for the benefit of the insurance companies. "In essence, [the Plaintiff asserts that] the Defendants used the State's police power to . . . attempt to put Plaintiff out of business. . . ." Id. at 6.
The criminal charges against Plaintiff were eventually dismissed, and a general release of liability was signed by the involved parties. Plaintiff alleges that he was suffering from severe financial and emotional distress, along with the threat of incarceration imposed by the State of Rhode Island, when he was "coerced" into signing the release. Id. at 6. Plaintiff therefore filed suit, [4] asking this Court to find that Defendants tortiously interfered with his contractual relations and his prospective contractual relations prior to causing the State to initiate the criminal proceedings, and subsequent to the dismissal of the criminal proceedings (Counts I, II, V and VI); also asking the Court to find that the Defendants acts and omissions constitute a malicious *Page 5 
prosecution (Count III); an abuse of process (Count IV)[5]; and were in violation of the Rhode Island Deceptive Trade Practices Act (Count VI) [sic][6].
Collectively, Defendants presently move for summary judgment on Counts I, II, III, V, and VI, claiming that Counts I, II, V, and VI must fail because Plaintiff, individually, did not and does not currently have a valid contractual relationship upon which to base his tortious interference claims. As to Count III, Defendants claim that the criminal prosecution of Plaintiff did not terminate in his favor so as to sustain a subsequent claim for malicious prosecution. Furthermore, Defendant Metropolitan and Defendant Amica move for summary judgment on Count IV, claiming that Plaintiff did not allege any facts which would support a finding that the criminal prosecution against him was misused or misapplied in some way to accomplish an ulterior or wrongful purpose for which such prosecution was not designed.
 II Standard of Review
Rule 56 of the Rhode Island Superior Court Rules of Civil Procedure empowers a trial justice, upon proper motion, to enter summary judgment. Our Supreme Court has established that
 Summary judgment is appropriate when, after viewing the admissible evidence in the light most favorable to the nonmoving party, no genuine issue of material fact is *Page 6 
evident from `the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' and the motion justice finds that the moving party is entitled to prevail as a matter of law. Santana v. Rainbow Cleaners, 969 A.2d 653 (R.I. 2009) (quoting Smiler v. Napolitano, 911 A.2d 1035, `038 (R.I. 2006) (quoting Super. R. Civ. P. 56 (c)).
In considering a motion for summary judgment, "the court may not pass on the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Lennon v. MacGregor,423 A.2d 820, 822 (R.I. 1980). Further, the "purpose of the summary judgment procedure is issue finding, not issue determination."Estate of Giuliano v. Giuliano,949 A.2d 386, 391 (R.I. 2008 (quoting Industrial Nat'l Bank v.Peloso, 121 R.I. 305, 307, 397 A.2d 1312, 1313 (1979)). During a summary judgment proceeding, "the only task of a trial justice in passing on a motion for summary judgment is to determine whether there is a genuine issue concerning any material fact."Peloso, 121 R.I. at 307, 397 A.2d at 1313 (citations omitted). When no such issue exists, the case is ripe for summary judgment.Id. at 308, 1313. "Therefore, summary judgment should enter `against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case.'"Lavoie v. North East Knitting, Inc.,918 A.2d 225, 228 (R.I. 2007) (quoting CelotexCorp. v. Catrett, 477 U.S. 317, 322 (1986)). *Page 7 
 III Analysis A Counts I, II, V, and VI
Defendants argue that Plaintiff, individually, has no viable claim under Tortious Interference with Contractual Relations ("Count I"), Tortious Interference with Prospective Contractual Relations ("Count II"), Continued Tortious Interference with Contractual Relations ("Count V"), and Continued Tortious Interference with Prospective Contractual Relations ("Count VI") of the Plaintiff's Second Amended Complaint because those claims belong to the former corporate entity, Miller's Auto Body, Inc. ("MAB") not to Plaintiff, David F. Miller as an individual. According to the Defendants, the contracts and any prospective contracts were with the business entity MAB, former plaintiff to this suit, which was the only entity legally capable of making auto body repairs to motor vehicles within the State of Rhode Island. Thus, argued Defendants, none of the claimed contracts was between various customers and the individual Plaintiff, David F. Miller. Instead, Defendants aver, the contracts were between various customers and the defunct corporate entity, MAB. As such, due to the Plaintiff's failure to abide by the requirements of Commercial Licensing Regulation Number 4 and § 5-38-4(a), Defendants maintain that there are not any valid contracts that Plaintiff can claim were tortiously interfered with by Defendants, neither prior to or subsequent to the criminal prosecution of Plaintiff.
Plaintiff contends that his claims set forth in Counts I, II, V, and VI of the Second Amended Complaint inhere to him as an individual because he continued to operate the *Page 8 
business of MAB until 2005. Plaintiff concedes that MAB's corporate charter was revoked on September 20, 1999, and it was never reinstated; thus Plaintiff agrees that this Court properly held that MAB did not have capacity to maintain suit against the Defendants. However, following the revocation of MAB's corporate charter, it is undisputed that Plaintiff continued to operate the business, repair vehicles, contract with customers, invoice and accept payments from customers, and insurance companies (including the Defendant insurance companies), pay his employees, pay bills, pay taxes, purchase business assets and materials and conduct all other operations that he had done prior to the issuance of the revocation of the charter until 2005. See Miller Aff. According to the Plaintiff, the assets of the former corporation known as MAB became the assets of Miller, as sole shareholder subject to the claims of any creditors. See DiPrete v.Vallone, 72 R.I. 137, 141, 48 A.2d 250, 253 (R.I. 1946). Plaintiff argues that although the revocation barred him from seeking protection of the corporate veil during that time period, he nevertheless operated his business, personally, albeit at his own risk.
Relying on § 7-1.2-1801, [7] which governs the unauthorized assumption of corporate powers, Plaintiff further argues that if the shareholders or principals of a corporation are personally liable for the debts of that corporation — where they continue to conduct business following the issuance of a certificate of revocation by the Secretary of State, and can be sued by a third party as such — then it logically flows that those individuals can sue a thirdparty on claims for damages suffered, which relate to the businessthat they continued to operate at their ownperil. (emphasis added). Consequently, Plaintiff contends that David F. Miller and MAB became "one and the *Page 9 
same" the day that the corporate charter was revoked and David F. Miller continued to operate the business. Thus Plaintiff argues that he can proceed personally against the Defendants under his Second Amended Complaint. Moreover, Plaintiff asserts that the License for Auto Body Repair that was issued to MAB and not Miller personally has no bearing on the case at bar. According to Plaintiff, whether or not David F. Miller was properly licensed with the State of Rhode Island to perform auto body repairs has no bearing on whether the Defendants tortiously interfered with Plaintiff's contractual and business relations. Plaintiff contends that his alleged lack of a proper license is not a prerequisite to entering into a contract with customers. Plaintiff maintains, at most, the lack of a proper license would only subject him to sanctions provided by state law and the Department of Business Regulation.
According to the Defendants, Plaintiff cannot claim to have or to succeed to any rights which may have formerly attached to or belonged to MAB. As such, Defendants contend that Plaintiff cannot try to claim that he was the sole shareholder for a defunct corporation and that he now has some right to the claims of the former Plaintiff, MAB. Furthermore, Defendants contend that the corporate wind-up period commences from the date of revocation of the corporate charter and within such a time limit a defunct corporation or former shareholder on its behalf, may file suit.See Section 7-1.2-1324.[8] *Page 10 
Thus, according to the Defendants, the power of the defunct corporation, MAB, to sue or be sued ran on or about September 20, 2001. Therefore, Defendants argue that the claims set forth in Counts I, II, V, and VI are not encompassed within the categories of tangible real or personal property claims or corporate claims properly asserted within the wind-up period, nor are they claims as to fixed liabilities or claims as to debts of the type that might survive beyond the two year post-corporate revocation period for filing suit. Moreover, Defendants assert that even if this Court were to apply the five year wind-up statute of § 7-1.1-1325, [9] the time period would have expired September 20, 2004. Therefore, according to Defendants, Plaintiff David F. Miller has no personal legal right as a former shareholder or officer of MAB to maintain Counts I, II, V, and VI of his Second Amended Complaint.
Lastly, as to Counts I, II, V, and VI, Plaintiff asserts that Defendants are estopped from asserting that David F. Miller cannot personally bring the claims. Between the time of revocation in 1999 and 2005, Plaintiff continued to service hundreds of vehicles that belonged to the Defendants' insureds. During that time period, the Defendants conducted appraisals, adjustments, supplements, and paid claims to Miller (as MAB) on behalf of their insureds for repair of vehicles owned by them. According to Plaintiff, the Defendants ignored the fact that they conducted thousands of dollars worth of business with the Plaintiff during that time period. Plaintiff argues that the Defendants cannot have it both ways: the Defendants cannot be entitled to profits from doing business with him *Page 11 
and, at the same time, claim that he is not entitled to seek redress for damages suffered by him as a result of their interference with his business and contracts. Consequently, according to the Plaintiff, the Defendants are now estopped from claiming that the Plaintiff cannot personally pursue this law suit.
 1 No Valid or Invalid Contractual Relationship with Motor Vehicle Repair Customers
As to Counts I and V, Plaintiff must prove all the elements for tortious interference with contractual relations. A valid claim for tortious interference with contractual relations requires that there be a contract; that the alleged wrongdoer has knowledge of said contract; that the alleged wrongdoer intentionally interferes with such contract; and that damages result from the alleged wrongdoer's intentional interference with such contract. UST Corp v. GeneralRoad Trucking Corp., 783 A.2d 931 (R.I. 2002). After the plaintiff establishes these prima facie elements, "[t]he burden of proving sufficient justification for the interference shifts to the defendant." Belliveau Building Corp. v. O'Coin,763 A.2d 622, 627 (R.I. 2000). "To demonstrate intentional interference, a claimant need not show actual malice or ill will. Legal malice or `an intent to do harm without justification' is sufficient." UST Corp., 783 A.2d at 937 (quotingJolicoeur Furniture Co. v. Baldelli,653 A.2d 740, 753 (R.I. 1995)). For the plaintiff to prevail, he or she must prove that, "ultimately, the defendant acted `without justification' or for an `improper' purpose." Id. (citing W. Page Keeton et. al., Prosser Keeton on the Law of Torts
ch. 24 § 129 978-79) (5th ed. 1984)). Many factors are instructive in determining whether alleged interference with the contract occurred without justification or was otherwise improper. These factors include: the nature of the actor's conduct, the *Page 12 
interests of the party with whom the actor's conduct interferes, and the relations between the parties. Restatement (Second)Torts § 767 (1979). Since the application of the listed factors is necessarily fact specific, "their utility and relevance in determining justification will vary on a case-by-case basis."UST Corp., 783 A.2d at 937. Thus a valid claim for tortious interference with contractual relations here requires that the Plaintiff prove the existence of a valid contract between the owners of the motor vehicles and the Plaintiff individually. At issue is whether or not such valid contract(s) existed between the Plaintiff and the third party vehicle owners following the revocation of MAB's corporate charter.
As a general principle, to enter into a valid legal agreement, the parties must have the capacity to do so. According to established contract law, "no one can be bound by contract who does not have the legal capacity to incur at least voidable contractual duties, and the capacity to contract may be partial and its existence in respect of a particular transaction may depend upon the nature of the transition or upon other circumstances." 17A Am.Jur 2d Contracts § 28. Moreover,
 "[i]n the absence of any statute continuing its existence, a corporation, after its dissolution or the expiration or forfeiture of its charter, cannot enter into new contracts or further transact business. Thus it has been held that a contract . . . by a dissolved corporation is void and of no effect. Other authority holds that dissolution terminates a corporation's power to enter into contracts unrelated to winding up and liquidation [of the corporation]." Am.Jur Corporations § 2484.
Relying on such principles, this Court finds that regardless of the fact that Plaintiff continued to operate MAB as usual following the revocation of its corporate charter, MAB did not have the power to enter into contracts unrelated to winding up and *Page 13 
liquidating the assets of the corporation. See Restatement (Second) Contracts § 12 (1981) ("[w]here partnerships or unincorporated associations have no power to contract as such, contracts made in their names bind the members instead"). As stated by our Supreme Court, "the revocation of a corporate charter has potentially grave implications for those who continue to operate the business. Financial obligations that are incurred during this period are not to be entered into lightly, for the law will protect the party victimized by these activities and will impose individual liability on those responsible for the debts." Kingfield WoodProducts, Inc. v. Hagan, 827 A.2d 619, 624 (R.I. 2003).
At present, Plaintiff, in his personal capacity, is claiming to be the party victimized by the allegedly tortious interference of the Defendants. Plaintiff contends that he entered into valid contracts on behalf of MAB, a corporation with a revoked corporate charter, even though he acknowledges it was at his own risk to personal liability. See Pls.' Answer to Def.'s Mot. Summ. Judg. 10. Although it is clear that our Supreme Court has held that those who continue to operate a business after the revocation of a corporate charter, or under the guise of a corporation not properly established, are subject to personal liability under both tort and contract law, the Court has not explicitly ruled on the issue of whether those individuals can sue third parties for claims relating to the now non-existent corporation. See Kingfield woodProducts, Inc. v. Hagan, 827 A.2d 619, 624 (R.I. 2003);see also 16A Fletcher, CycCorp § 8117 (2003) ("[o]fficers and directors who continue the business of a corporation after its dissolution or forfeiture of its charter in violation of their statutory duty as trustees to liquidate the corporation and distribute its assets, have been held personally liable for debts contracted while so unlawfully operating the business, even though incurred at a time subsequent to their *Page 14 
active participation in the business affairs on behalf of the corporation, and even if the corporation is subsequently reinstated").
Consequently, "[a] dissolved corporation generally does not have authority to execute contracts, except for the purpose of winding up its business and affairs. . . ." 16A Fletcher, CycCorp § 8118 (2003). "However, a contract executed in the name of a dissolved corporation may be enforceable when the contracting party entered the contract without knowledge of the dissolution or the contracting party would not be prejudiced by enforcement."Id. Furthermore, according to § 7-1.2-1325,
 [a]ny corporation dissolved in any manner under this chapter or any corporation whose existence is terminated under § 44-12-8 or any corporation whose articles of incorporation are revoked by the secretary of state under § 7-1.2-1310 nevertheless continues for five (5) years after the date of the
dissolution, termination, or revocation for the purpose of enabling it to settle and close its affairs, to dispose of and convey its property, to discharge its liabilities, and to distribute its assets, but not for the purpose of continuing the business for which it was organized. The shareholders, directors, and officers have power to take any corporate or other action that is appropriate to carry out the purposes of this section. (Emphasis added).
In Rhode Island, such a statute has provided "for a post-dissolution period in which a corporation remains extant beyond its dissolution date for the limited purposes of winding up the business and of defending lawsuits or filing any claims related to the business."Theta Properties v. Ronci Realty Co., Inc.,814 A.2d 907, 912 (R.I. 2003) (addressing § 7-1.1 et. seq. — the predecessor[10] to § 7-1.2 et seq.). *Page 15 
Moreover, § 7-1.2-1311(b) provides that "[u]pon the issuance of the certificate of revocation, the authority of the corporation to transact business in this state ceases."[11] With regards to dissolution, § 7-1.2-1324 indicates that:
 [t]he dissolution of a corporation . . . does not take away or impair any remedy available to or against the corporation, its directors, officers, or shareholders, for any right or claim existing, or any liability incurred, prior to the dissolution if action or other proceeding on the right, claim, or liability is commenced within two (2) years after the date of the dissolution. Any action or proceeding by or against the corporation may be prosecuted or defended by the corporation in its corporate name. . . . Section 7-1.2-1324.
Despite their similarities, our courts have consistently treated corporations that have had their charters revoked with less kindness than those which have gone through dissolution. When a corporate charter is revoked, principals and officers who continue to do business in the name of the corporation will be held liable for its debts. See Harris v. Turchetta,622 A.2d 487, 489 (R.I. 1993). "Unlike the orderly dissolution of a corporation in which the principals are shielded from personal liability for actions taken during the winding up period, when a corporation's charter has been revoked, the *Page 16 
principals of that corporation are exposed to liability and enter into contracts at their peril." Kingfield Wood Products,Inc. v. Hagan, 827 A.2d 619, 623-24 (R.I. 2003) (internal citations omitted). Pursuant to this idea, the Supreme Court has rejected the idea that — after revocation of the charter — an entity is a de facto corporation.Id. at 624. Even when the corporate charter is reinstated, individuals nonetheless remain liable for acts occurring during the period of revocation. Id. The Court succinctly pointed out that "the revocation of a corporate charter has potentially grave implications for those who continue to operate the business."Id.
The corporate charter of MAB was revoked on September 20, 1999. It is undisputed that Plaintiff admits that he nevertheless operated the business, personally and at his own risk, following the revocation of the corporate charter. Plaintiff continued to operate the business of MAB by repairing vehicles, contracting with customers, invoicing and accepting payments from customers and insurance companies (including the Defendants), paying his employees, paying bills, purchasing business assets and materials, and conducting all other operations that he had done prior to the issuance of the revocation. See David F. Miller Aff. 1. However, this Court finds that a "dissolved corporation is prohibited from conducting any new business," and Plaintiff continued to conduct new business as if MAB was still a valid legal entity. See Fletcher, CycCorp § 8117 (2003) (finding that "[d]irectors and officers of a dissolved corporation," such as Plaintiff, "generally do not have authority to . . . carry on business, except for the purpose of winding up or liquidating its business and affairs"). Thus "[d]irectors and officers are subject to personal liability if the corporation continues to carry on business as a going concern."Id.; see also Steve's Equipment Service,Inc. v. Riebrandt, 121 Ill. App. 3d 66 (1984) *Page 17 
(finding that the statute made the officer personally liable for contracts entered into on behalf of an involuntarily dissolved corporation only where the officer knew or because of his position should have known of the dissolution at the time he entered the contract).
Although Plaintiff admitted to this Court that he was unaware that the corporate charter of MAB had been revoked, Plaintiff, as the sole shareholder, director, and officer of MAB, was singularly responsible for the annual report that is required to be submitted to the Secretary of State, pursuant to § 7-1.2-1501, [12] to be filed on behalf of the corporation to be authorized to transact business in this state. As Plaintiff stated, "[o]ver the last twenty-five years," he entered into and maintained many contracts and business relationships with various customers for automobile repair and maintenance at MAB. See Pls.'Sec.Am.Comp. 7. As such, Plaintiff previously had filed annual reports with the Secretary of State, pursuant to § 7-1.2-1501; otherwise MAB's corporate charter would have been revoked or suspended prior to September 20, 1999. Thus a contract executed in the name of the dissolved corporation, albeit as Plaintiff personally on behalf of MAB, is unenforceable because he had knowledge of the dissolution of the corporation at the time of contracting with third party customers. See Fletcher, Cyc Corp § 8118; but cf.Automatic Sprinkler Co. of America v. Star Clothing Mfg. Co.,306 Mo 518, 267 SW 888 (1924) *Page 18 
(as cited by Plaintiff) (finding that the mechanics lien was enforceable for balance due for installation contracted for by the sole officer and stockholder of such corporation after the corporation's charter had expired by operation of law but before either of the contracting parties had actual knowledge of the expiration thereof).[13]
Nevertheless, Plaintiff asserts that "[i]t is of no consequence that contracts for repair may have been entered into between a customer and MAB." See Pls.'Answer to Def.'s Motion 9. Notwithstanding Plaintiff's assertion, the Court finds it is important to note that Plaintiff was carrying on new business on behalf of MAB, a dissolved corporation for purposes that were not winding up business affairs. Although Plaintiff is neither attempting to hide behind a corporate veil nor trying to deny his personal liability during the period after the revocation of MAB's corporate charter, the Plaintiff is making a claim against the Defendants, relying on the fact that there was a valid legal contract. "The party opposing summary judgment has the burden of producing `competent evidence [of] the existence of a disputed material issue of fact . . . and cannot rely upon mere allegations or denials in the pleadings, mere conclusions, or mere legal opinions.'" Kingfield Wood Products, Inc. v. Hagan,827 A.2d 619, 625 (R.I. 2003) (quoting Star-Shadow Productions,Inc. v. Super 8 sync Sound System,730 A.2d 1081, 1083 (R.I. 1999) (per curiam) (quoting Hale v.Marshall Contractors, Inc., 667 A.2d 1252, 1254 (R.I. 1995)). *Page 19 
Here, Plaintiff has not produced competent evidence of the existence of a disputed material fact. In fact, Plaintiff did not produce adequate proof of a valid contract between himself and third parties to allow Plaintiff to prevail on either Count I or V of his Second Amended Complaint. As such, this Court grants Defendants' motion for summary judgment as to Counts I and V.
 2 Estoppel
Regarding any estoppel argument for both the existing and prospective business relationships, "estoppel is `extraordinary' relief, which `will not be applied unless the equities clearly [are] balanced in favor of the part[y] seeking relief.'" SturbridgeHome Builders, Inc. v. Downing Seaport, Inc.,890 A.2d 58, 67 (R.I. 2005) (quoting Southex Exhibitions,Inc. v. Rhode Island Builders Association, Inc.,279 F.3d 94, 104 (1st Cir. 2002) (applying Rhode Island law)). Additionally, an estoppel claim requires two elements: first, an affirmative representation on the part of the person against whom the estoppel is claimed, which is directed to another for the purpose of inducing the other to act or fail to act in reliance thereon; and secondly, that such representation or conduct in fact did induce the other to act or fail to act to his injury.See Providence Teachers Union v. ProvidenceSchool Board, 689 A.2d 388, 391-92 (R.I. 1997); seealso El Marocco Club, Inc. v. Richardson,746 A.2d 1228, 1233, 1234 (R.I. 2000) (the key element of an estoppel is intentionally induced prejudicial reliance) (quotingEast Greenwich Yacht Club v. Coastal Resources ManagementCouncil, 118 R.I. 559, 568, 376 A.2d 682, 686 (1977)). *Page 20 
Notwithstanding that Defendants may well be estopped from undoing the transactions that occurred in the past, the record in the instant case is devoid of any evidence from which a fact finder might draw an inference that Defendants intentionally induced any prejudicial reliance with regard to any existing or prospective relations that Plaintiff may engage in. This Court declines to apply the doctrine of estoppel in the manner suggested by the Plaintiff.
 3 Prospective Business Relationship or ExpectancyThereof
As to Counts II, Tortious Interference with Prospective Contractual Relations, and VI, Continued Tortious Interference with Prospective Contractual Relations, the tort of issue is interference with prospective contractual relations. The elements of this tort are satisfied when one "intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation, or (b) preventing the other from acquiring or continuing the prospective relation."Mesolella v. City of Providence,508 A.2d 661, 679 (R.I. 1986). The particular elements of the tort include: "the existence of a business relationship or expectancy, knowledge by the interferor of the relationship or expectancy, an intentional act of interference, proof that the interference caused the harm sustained and damages to the plaintiff." Id.;see also James O. Pearson, Jr., J.D., Annotation,Liability for interference with at will businessrelationship, 5 A.L.R. 9, 16 (1981). This tort is identical to a claim based on tortious interference with contractual relations, as set forth in Counts I and V, "except for the *Page 21 
requirement in the latter [tortious interference with contractual relations] that an actual contract exist[s]." Id.;see also Smith Development Corp. v. BilowEnterprises, Inc., 112 R.I. 203, 211, 308 A.2d 477, 482 (1973).
At present, regarding the tort of tortious interference with contractual relations, the issue becomes whether there was a business relationship or expectancy that existed between Plaintiff and the Defendants. From the date of the revocation of MAB's corporate charter until 2005, Plaintiff continued to operate the business in the same manner by repairing vehicles, contracting with customers for repairs, and invoicing and accepting payments from customers and insurance companies, including the Defendant Insurance Companies. See David F. Miller Aff. 1. In an action to recover for tortious interference with prospective contractual relations, the plaintiff "must establish that it had a "business" relationship with a third party, i.e. a party independent of the defendant prior to the alleged interference by the defendant. Generally, a "business" relationship is one that involves the prospect of economic gain as the result of a commercial transaction or transactions. The relationship need not be one that is intended to culminate in a formal contract. Thus a "business" relationship will include virtually any prospective transaction for the purchase or sale of any commodity or service. . . ." Laura Krohn, J.D., Annotation, Causes of Action for Interference with ProspectiveBusiness Advantage, 16 Cause of Action § 5 (2009);see also PRN of Denver Inc v. Arthur JGallagher Co, 531 So.2d 1001 (Fla App 1988) ("the tort of interference with an advantageous business relationship does not require that the relationship be evidenced by an enforceable contract"); see also Stehno v. SprintSpectrum, L.P., 2006 WL 328674 (Mo. 2006) ("a business expectancy sufficient to support a claim for tortious interference with business *Page 22 
expectancy need not be based on an existing contract; a probable future business relationship that gives rise to a reasonable expectancy of financial benefit is enough"); seealso Commercial Business Systems, Inc. v. HalifaxCorp, 484 SE2d 892 (V.A. 1997) (proof of existence of business relationship or expectancy and reasonable certainty that plaintiff would have continued in relationship or realized expectancy absent defendant's misconduct must meet objective test; proof of subjective expectations will not suffice to create cause of action for tort of wrongful interference with prospective business or economic advantage).
Furthermore, "[p]roper identification of the source of the business opportunity" must be made, and plaintiff must "demonstrate that the source is independent of the defendant." Laura Krohn, J.D., Annotation, Causes of Action for Interference with ProspectiveBusiness Advantage, 16 Cause of Action § 5 (2009). Additionally, "the plaintiff must prove that there was a reasonable expectancy of realizing economic gain as a result of the business relationship the plaintiff had established with the third party. While it is not necessary to show a legally enforceable contract with the third party, it generally is necessary to show that the relationship with the third party had proceeded beyond the point of `mere anticipation' of entering into a contract." Id.
At present, "[o]pportunity to obtain customers is one of the expectancies protected by the tort action for interference with prospective advantage." W. Prosser, Handbook of the Law ofTorts § 130 at 950 (4th Ed. 1971). Here, Plaintiff has not established that he has entered into contracts and business relationships with various customers for automobile repair and maintenance. As stated supra, Plaintiff attempted to enter into business relationships with the owners of the motor vehicles on the basis that he was a *Page 23 
valid business entity. However, as explained above, after the revocation of MAB's corporate charter, Plaintiff no longer had a valid legal capacity to enter into contracts under the guise of continuing the original purpose of MAB, repairing motor vehicles.See Fletcher, Cyc Corp § 8117 (2003) (finding that "[d]irectors and officers of a dissolved corporation," such as Plaintiff, "do not have authority to . . . carry on business, except for the purpose of winding up or liquidating its business and affairs"); see also Theta Properties v. Ronci RealtyCo., Inc., 814 A.2d 907, 912 (R.I. 2003) (addressing § 7-1.1 et seq. — the predecessor to § 7-1.2 et seq.) (stating that § 7-1.1 provides "for a post-dissolution period in which a corporation remains extant beyond its dissolution date for the limited purposes of winding up the business and of defending lawsuits or filing any claims related to the business"). Therefore, Plaintiff has failed to establish a genuine issue concerning any material fact. Thus this Court grants Defendants' motion for summary judgment as to Counts II and VI.
Considering the failure of Plaintiff to establish the first element of his claim of tortious interferences with prospective contractual relations, this Court need not decide whether the remaining elements that the Plaintiff is required to prove were established. However, for the purposes of discussion, this Court notes our Supreme Court's recent explanation in Avilla v. NewportGrand Jai Alai LLC, 935 A.2d 91 that the element of the tort requires a showing of an "intentional and improper" act of interference, not merely an intentional act of interference.See also Restatement (Second)Torts § 766b, cmt. D at 22 (1979); see alsoBelliveau Building Corp v. O'Coin,763 A.2d 622, 628 n. 3 (R.I. 2000). *Page 24 
 3 Licensing Requirement
As to Counts I, II, V, and VI, the motion for partial summary judgment must be granted due to Plaintiff's failure to abide by the licensing requirements set forth in § 5-38-4(a) and Commercial Licensing Regulation # 4. Under such regulations, a "Motor Vehicle Body License" means a license issued by the Department of Business Regulation to an entity engaged in the business of Motor Vehicle Body Work. According to Restatement (Second) ofContracts § 181,
 [i]f a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if: (a) the requirement has a regulatory purpose, and (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement. To determine whether a measure has a regulatory purpose, a court will consider the entire legislative scheme, including any relevant declaration of purpose. Common indications of regulation . . . ensure that standards are maintained.
Under § 5-38-4(a) and Commercial Licensing Regulation Number 4, any entity seeking to operate as an auto body repair shop must possess a license. Section 5-38-4, in pertinent part, states:
 [n]o person, firm or corporation shall engage within this state in the business of auto body repairing or painting or entering into contracts for the repairing, replacing or painting of auto bodies or parts of auto bodies . . . or represent in any form or matter that he, she or it is an auto body shop unless that person, firm, or corporation possesses a license in full force and effect from the Department of Business Regulation specifying that person, firm or corporation has license to operate or conduct an auto body shop. *Page 25 
Pursuant to § 5-38-4, Commercial Licensing Regulation # 4 was enacted by the Director of the Department of Business Regulation, requiring that an entity engaged in the business of motor vehicle body work is required to possess a license. In the present case, Plaintiff does not assert that he was properly licensed with the State of Rhode Island to perform auto body repairs. See Pls.' Ans. to Def.'s Motion 12.
Section 5-38-4 constitutes a regulatory purpose of controlling those operating motor vehicle repair businesses in Rhode Island. The State of Rhode Island has a strong interest in carrying out the purpose of the statute to regulate and keep track of the individuals who are allowed to "engage in the business of auto body repairing or painting or enter[ing] into contracts for the repairing, replacing, or painting of auto bodies or parts of auto bodies or advertise or represent in any form or manner that he, she, or it is an auto body shop." See Section 5-38-4(b). The same section clearly mandates that those individuals shall not engage in such activity "unless that person, firm, or corporation possesses a license in full force and effect from the Department of Business Regulation specifying that person, firm, or corporation as licensed to operate or conduct an auto body shop." Id. Chapter 5-38, "Automobile Body Repair Shops" currently contains some twenty-five (25) sections.[14] Section 5-38-10, "Grounds for denial, suspension, or revocation of licenses," lists the multiple ways that such a license may be denied, suspended, or revoked. The grounds for denial, suspension or revocation are set forth as:
 (1) On proof of unfitness of the applicant to do business as an automobile body repair shop;
 (2) For any misstatement by the applicant in his or her application for license; *Page 26 
 (3) For any failure to comply with the provisions of this section or with any rule or regulation promulgated by the commission under § 5-38-5;
 (4) For defrauding any customer;
 (5) For dismantling any automobile without the written authorization of the owner of the automobile;
 (6) For refusing to surrender any automobile to its owner upon tender of payment of the proper charges for towing storage, and work done on that automobile;
 (7) For having indulged in any unconscionable practice relating to the business as an automobile body repair shop;
 (8) For willful failure to perform work as contracted for;
 (9) For failure to comply with the safety standards of the industry;
 (10) For the purchase of used vehicle parts from unlicensed entities; or
 (11) For failure to comply with the requirements of § 5-38-30.[15]
This Court finds that Chapter 5-38 and the specific statutes clearly have a regulatory purpose.
Plaintiff, in his individual capacity, never possessed a valid license in full force and effect from the Rhode Island Department of Business Regulation, specifying that he was licensed to operate or conduct an auto body repair shop. As such, Plaintiff's *Page 27 
promises made in consideration of his doing motor vehicle repair work or of his promise to do the work are unenforceable on grounds of public policy. See Restatement (Second) ofContracts § 181. As such, Plaintiff has no legally cognizable promise or contractual relationship with any customers for the making of repairs to the bodies of motor vehicles.
 B Count III, "Malicious Prosecution"
As grounds for said motion, Defendants aver that said count for malicious prosecution cannot be brought or maintained by Plaintiff because the underlying criminal prosecution against Plaintiff did not terminate in his favor, as required, to support such a cause of action. There are no genuine issues of material fact in this regard. Since Plaintiff is unable to prove this prerequisite to sustain an action for malicious prosecution, summary judgment will enter for Defendants, denying and dismissing complaint of Plaintiff as to Count III, malicious prosecution.
Although Defendants passed along information to the RISP and Rhode Island Attorney General's Office regarding Plaintiff's business practices, contrary to Plaintiff's assertion, the Defendants assert that there is no existence of malice on their part. Under Rhode Island law, to maintain a claim for malicious prosecution a tort plaintiff must prove: (1) the initiation of a criminal proceeding by a tort defendant against the tort plaintiff; (2) the termination of such criminal proceeding in the tort plaintiff's favor; (3) lack of probable cause on the part of the tort defendant in initiating the criminal proceeding; (4) the existence of malice toward the tort plaintiff on the part of the tort defendant; and (5) damages sustained by the tort plaintiff as a result thereof. Henshaw v.Doherty, *Page 28 881 A.2d 909 (R.I. 2005); Toste Farm Corp. v. Habury, Inc.,798 A.2d 901, 907 (R.I. 2002); Kingston Mobile Home Park v.Strashnick, 774 A.d 847, 858 (R.I. 2001).
As to the first element of malicious prosecution claim, our Supreme Court has said that "it is established that a defendant cannot be held liable for malicious prosecution unless he or she takes some active part in instigating or encouraging the prosecution. If a defendant, in good faith, passes along accurate information to the proper authorities, he or she is not "actively" instigating the proceeding." Morinville v. Old ColonyCoOperative/Newport National Bank, 522 A.2 1218 (R.I. 1997) (emphasis added); see also
Prosser Keeton, The Law ofTorts § 119 at 872-73 (5th ed. 1984). All of the following — depositions of three detectives of RISP; the investigation of Plaintiff; the determination as to how to set up a sting operation involving Plaintiff; the manner in which RISP intended to bring criminal charges against Plaintiff; and specifically, what charges it intended to bring — were the sole decision of RISP and not of Defendants. See Det.Doucet Dep. 121-122, 124-125 Feb. 2, 2010; Det.Kershaw Dep. 79-81 Feb. 25, 2010; Det.Dicomitis Dep.; seealso Hoffman v. Davenport-Metcalf,851 A.2d 1083, 1090 (R.I. 2004). Furthermore, RISP conducted its own investigation and determined how to prosecute the Plaintiff in this matter.[16]
Notwithstanding the above, Plaintiff adamantly maintains that the Defendants knowingly provided false information to the authorities to ensure the prosecution of Plaintiff. As evidence of this, Plaintiff mainly relies on his own Second Amended *Page 29 
Complaint and his assertions set forth in his affidavit.See Pls.' Ex. 1, 4. No evidence of such is elsewhere provided. Instead, a plethora of evidence was presented that the specific vehicles provided to RISP were from the Defendants.See Pls.' Ex. 11, at 1; see also Pls.' Ex. 8, at 15; see also Pls.' Ex. 9, at 44, 68;see also Det.Kershaw Dep. 52 Feb. 25, 2010 (referencing Exhibit 5, an office memorandum provided by Amica, counsel for Plaintiff asked Detective Kershaw if Exhibit 5 " . . . goes on to note that, `[t]he Mercedes was eventually turned over to the state police per release agreement for their use during the investigation[]"); see also Det.Doucet Dep. 27 Feb. 22, 2010 (". . . well I know there was an appraisal provided to us[,] [RISP]. I'm looking to see which insurance company the Audi came from. Metropolitan"). "While the element of malice has been variously defined, it is generally held that it may be established by a showing that the person initiating the original action was [motivated] by a primary motive of ill will or hostility, or did not believe that he would succeed in that action."Nagy v. McBurney, 120 R.I. 925, 392 A.2d 365 (R.I. 1978);Gore v. Gorman's Inc., 143 F.Supp. 9, 14 (W.D.Mo. 1956). "Proof of ill will, however, is not a sine qua non, for a hostile motive may also be inferred form a showing of a lack of probable cause, but may not be drawn from the "mere failure" of the original action." Id.; DeFusco v. Brophy,112 R.I. 461, 463 n. 1, 311 A.2d 286, 287 n. 1 (1973); see Det. Doucet Dep. 121-122, 124-125, Feb. 22, 2010; Det. Kershaw Dep. 79-81, Feb. 25, 2010.
Furthermore, "[p]roof of malice alone, even in the extreme, will not suffice to establish a case of malicious prosecution unless accompanied by a showing that the original action was instituted without probable cause. Probable cause is defined as the existence of a state of facts sufficient to cause an ordinarily and prudent person to believe *Page 30 
the accused guilty." McBurney,120 R.I. at 929-930, 392 A.2d at 367; see alsoQuinlan v. Breslin, 61 R.I. at 320, 200 A.2d at 991. The Restatement (Second) Torts § 675 (1977) explains the existence of probable cause as follows:
 One who takes an active part in the initiation, continuation or procurement of civil proceedings against another has probable cause for doing so if he reasonably believes in the existence of the facts upon which the claim is based and either: (a) correctly or reasonably believes that under those facts the claim may be valid under applicable law, or (b) believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge and information.
Based upon the depositions of the RISP detectives, the appraisal reports of MAB and Plaintiff, and the sting operation performed by the RISP, it would seem that an ordinarily careful and prudent person would believe that Plaintiff may be guilty of the criminal charges pursued against him. The fact issue really involves whether the Defendants' and their agents were acting in goodfaith.[17] (Emphasis added).
To resolve the issue, it will be necessary to examine the Defendants' intent. Intent is a mental attitude with which an individual acts, and therefore it cannot ordinarily be directly proved but must be inferred from surrounding facts and circumstances. See Thomson Gale, West's Encyclopedia ofAmerican Law. In criminal cases where an individual's intent is an issue, justices of the Superior Court routinely give the following instruction, or a substantially similar version thereof.
 A person's intent or state of mind cannot be proved directly, because there is no way of directly looking into the workings of the human mind. But you may infer the defendant's intent or state of mind from the surrounding circumstances. You may consider any statement made or *Page 31 
acts done or omitted by the defendant, and all other facts and circumstances received in evidence which would indicate to you the defendant's intent or state of mind. See Pattern Criminal Jury Instructions, Rhode Island Department of Attorney General, VII Definition of Legal Concepts, A. Intent.
Also this Court looks to Federal JuryPractice Instructions § 14.13 (3d ed. 1977), which states:
 Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made and [any act] done or omitted by the defendant, and all other facts and circumstances in evidence which indicate his state of mind. You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. As I have said, it is entirely up to you to decide what facts to find from the evidence.
For Plaintiff to prove a claim for malicious prosecution, he must also prove that the criminal prosecution terminated in his favor. Here, the underlying criminal prosecution of Plaintiff was dismissed by the Rhode Island Attorney General under Rule 48(a). Such a dismissal by the State terminates the criminal prosecution; however, it does not result in a determination of such criminal defendant's "innocence" or serve as an acquittal of the Defendant.State v. Reis, 815 A.2d 57 (R.I. 2003). Furthermore, according to Restatement (Second) Torts, "[a] termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of the case of action for malicious prosecution if (a) the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused. . . ." Restatement (Second)Torts § 660, "Indecisive Termination of *Page 32 
Proceedings." Cf. Quinal v. Breslin,61 R.I. 327, 200 A. 989 (R.I. 1938) (dismissal of defendant's complaint against plaintiff for failure to prosecute amounted to a voluntary dismissal of the prosecution and was prima facie evidence of want of probable cause).
Although Rhode Island law does not specify what constitutes a successful termination of the underlying criminal charge against the criminal defendant, many jurisdictions emphasize that any dismissal of a criminal prosecution based upon a compromise agreement with the criminal defendant is not a successful termination in favor of that party and does not sustain a subsequent malicious prosecution cause of action by that party. See Ash v. Ash,72 Ohio St.3d 520, 651 N.E.2d 945 (Ohio 1995) (finding that "a prosecution that is terminated by reason of a voluntary settlement or agreement of compromise with the accused is not indicative of guilt or innocence and therefore, is not a termination in favor of the accused); see also Prosser Keeton, Law ofTorts § 119 (5th Ed. 1984); 54 C.J.S.Malicious prosecution § 55 (1987); 52 Am.Jur. 2d Malicious Prosecution § 43 (1970); seealso 3 Restatement (Second) ofTorts § 660 (1977) (Furthermore a termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if (a) the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused"). Moreover, the purpose of this rule is that "[a]lthough the accused by his acceptance of a compromise does not admit his guilt, the fact of compromise indicates that the question of his guilt or innocence is left open. Having brought peace the accused may not thereafter assert that the proceedings have terminated in his favor." Restatement (Second)Torts § 660, comment (c) (1977). As such, the question of whether the criminal proceeding was *Page 33 
terminated in favor of the Plaintiff or not, is a matter for this Court to decide. Based on the record and the relevant law, this Court is satisfied that the underlying dismissal of the criminal prosecution by compromise is an insufficient basis upon which to claim the favorable termination of such action required to evidence the tort of malicious prosecution. Thus the Defendants' motion for partial summary judgment as to Count III, "Malicious Prosecution," is granted on that ground notwithstanding that the issue of Defendants' intent would be a fact issue for the jury.
 C Count IV, "Abuse of Process"
As to Count IV, Abuse of Process, Defendants — Metropolitan and Amica — argue that Plaintiff is unable to prove any facts necessary to support a finding that the criminal prosecution against him by the RISP was misused, misapplied, or perverted in some way by the Defendants to accomplish an ulterior or wrongful purpose for which it was not designed. However, according to Plaintiff, Defendants' motion must be denied because there are more than sufficient facts to evidence that the Defendants not only instituted the criminal proceedings against him, but the Defendants did not have a good faith belief or basis in filing such. Specifically, Plaintiff argues that Defendants knowingly provided the RISP and the Rhode Island Attorney General's office with false and misleading information to induce their prosecution of Plaintiff.
Furthermore, Plaintiff asserts that the Defendants were purposefully withholding other vital fact information, such as information concerning "cost shifting" and the condition of the sting vehicles used prior to and during the course of the criminal proceedings. Plaintiff alleges that Defendants took this action to obtain an economic *Page 34 
advantage by putting him out of business, and to rid themselves of a long-standing legislative "thorn in the side." Moreover, Plaintiff contends that Defendants wanted to coerce their present and potential insureds to use one of their own "preferred auto body shops," which according to Plaintiff, operate for Defendants financial benefit. Lastly, Plaintiff argues that it is clear that the Defendants financed the investigation, based on the evidence set forth in the police narratives and various affidavits, which allegedly note that the restitution paid by Plaintiff was to reimburse Defendants for their costs during the investigation.
Under Rhode Island law, a tort plaintiff, in a claim for abuse of process, must prove: (1) the institution or initiation of a criminal proceeding by the tort defendant against the tort plaintiff; (2) the use of such proceedings for an ulterior orwrongful purpose that the criminal proceedings were not designed toaccomplish; and (3) damages sustained by the tort plaintiff as a result thereof. Butera v. Boucher,798 A.2d 340 (R.I. 2002) (emphasis added). "The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion." See W. Page Keeton, Prosser Keeton onTorts 898 (West, 5th ed. 1985).
In the present case, Defendants claim that they simply, in good faith, passed along accurate information involving the Plaintiff and the business practices of MAB to the RISP. According to the Defendants, RISP then took that information and made its own determination in regard to all aspects of the criminal prosecution that it initiated against *Page 35 
MAB and Plaintiff. Thus Defendants contend that they did not institute or initiate the criminal proceeding against Plaintiff, rather the RISP did.
However, Plaintiff argues that the Defendants initiated the proceedings against the Plaintiff and MAB by knowingly providing the RISP and Rhode Island Attorney General with false and misleading information to induce the subsequent prosecution of Plaintiff.[18]
Specifically, Plaintiff alleges that Defendants "requested that the RISP and RIAG initiate proceedings based on false information, false allegations and deceitful conduct and practices for the purposes of putting Plaintiffs out of business." See
Pls.'Sec.Am. Compl. 11. Furthermore, Plaintiff argues that the RISP proceeded with their investigation under the premise that vehicles are required to be repaired in accordance with insurance company appraisals and/or that the appraisal is a contract for repair of the vehicle.[19] As such, Plaintiff asserts that the RISP would not have "wrongfully" initiated such criminal proceedings against him had if not been for Defendants decision to provide false and misleading information to the RISP.
This Court finds that there is a genuine issue of material fact as to whether or not the Defendants initiated the criminal proceedings or the process behind the criminal proceedings with the RISP against the Plaintiff, or if the RISP had previously initiated *Page 36 
such a process and were only requesting the assistance of Defendants, Metropolitan and Amica, in carrying forth their own investigation. Plaintiff alleges that Defendants took such action with the RISP to put Plaintiff out of business and to coerce their insured to use one of their own "preferred" shops for their economic advantage. However, the Defendants attempt to show the Court their reliance on the RISP and to demonstrate that the RISP decided when and in what manner to conduct an investigation against Plaintiff.
Defendants also argue that, similarly to the fact pattern at hand, "[a]ny individual has the right, perhaps even the responsibility, to report to the police conduct that he or she in good faith believes to be illegal, particularly if he or she is the victim of such conduct." Hoffman, 851 A.2d at 1090. Furthermore, "[t]he fact that the complaints were subsequently dismissed, even if, as plaintiffs suggest, the judge found there was insufficient evidence, does not lead inexorably to the conclusion that [Defendants] initiated the proceeding maliciously or to gain an advantage not properly involved in the proceeding itself." Id. at 1090. However, in the Hoffman case, "[t]he problem [wa]s, all the exhibits tend[ed] to show that [Defendants] [had] a reason to bring" the matter to the attention of law enforcement; whereas here, despite the numerous exhibits, affidavits, and depositions presented to this Court, the evidence as to the particular involvement of Defendants is unclear as to whether the Defendants had a valid reason to report the potential misconduct and initiate the criminal proceedings. Id. at 1091. Even though Defendant, Amica, asserts that its involvement was only at the request of the RISP, the communications and particular participation of Defendants, Amica and Metropolitan, in the criminal proceedings and use thereof against the Plaintiff are not clear to the Court at this time. *Page 37 
"To avoid summary judgment the party opposing the motion cannot rest upon mere allegations or denials but must affirmatively set forth competent evidence that raises a genuine issue to be resolved." Id.; see also Harritos v.Cambio, 683 A.2d 359, 360 (R.I. 1996). Here, Plaintiff specifically asserts that his involvement in legislative committees with the Rhode Island General Assembly, and auto body commissions geared at reforming the manner in which issues regarding labor rates and parts were handled by the insurance industry affected the manner in which Defendants chose to initiate the criminal proceedings against him. Furthermore, the Plaintiff alleged that the initiation of the RISP criminal proceedings by the Defendants was for an ulterior or wrongful purpose due to his efforts to accomplish reform in these areas. As such, Plaintiff asserts that he allegedly became a target for the insurance industry, particularly these two Defendants.[20] Upon review of the admissible evidence in the light most favorable to the Plaintiff, the Court is satisfied that there is a genuine issue of material fact evidence from the pleadings, depositions, admissions on file, and affidavits as to Defendants' institution or initiation of a criminal proceeding against the Plaintiff, along with the use of such proceedings for an ulterior or wrongful purpose that the criminal proceedings were not designed to accomplish. Therefore, Defendants' motion for partial summary judgment as to Count IV of the Second Amended Complaint is denied.
 IV *Page 38 Conclusion
For the foregoing reasons, Defendants' Motion for Partial Summary Judgment on Counts I, II, III, V, and VI of Plaintiff's Second Amended Complaint is granted. The Motion of Defendants, Metropolitan and Amica, for Partial Summary Judgment as to Count IV of Plaintiff's Second Amended Complaint is denied.
Counsel shall prepare and submit an appropriate order for entry. *Page 1 
 AMENDED DECISION
This amended decision is being filed to correct the following:
The C.A. number in the title of this case reads C.A. No. 09-0924 and it should readC.A. No. 06-3336.
The remaining contents of this decision filed on September 7, 2010 remain the same.
[1] Presumably, "MetLife" is the defendant, Metropolitan.See Pl.'s Ex. H ("Metropolitan Property and Casualty Insurance Company (MetLife) provided" a vehicle for the sting operation.)
[2] The affidavit of Detective Doucet indicates that an undercover investigation was initiated "based on several complaints which alleged that the business owner was engaged in the practice of committing insurance fraud"). Doucet Aff. 1.
[3] The Second Amended Complaint is mis-numbered. There are two counts which are both marked as "Count VI."
[4] Originally, Miller's Auto Body, Inc. ("MAB"), Plaintiff's auto body repair shop, was also a named-plaintiff filing suit against the Defendants. Defendants moved for partial summary judgment, on March 23, 2010, before an associate Justice of the Superior Court, who denied and dismissed the Second Amended Complaint as to Miller's Auto Body, Inc. The motion was granted as to all Defendants.
[5] Defendants moved for partial summary judgment as to Count IV, "Abuse of Process" of the Second Amended Complaint of Plaintiff during a hearing before an associate Justice of the Superior Court. On March 23, 2010, the Court denied the motion as to Defendants, Metropolitan and Amica, but granted it as to Defendant, Allstate without prejudice to Plaintiff seeking reconsideration of said grant based upon the deposition testimony of William Neyman and George Driscoll and/or documents produced by them. The Order further indicated, "[N]o further depositions or document requests directed to this issue may be used by the Plaintiff for seeking said reconsideration without further application to this Court."
[6] Defendants' motion for partial summary judgment denying and dismissing Count VI [sic], "Violation of the Rhode Island Deceptive Trade Practices Act" of the Second Amended Complaint of Plaintiff, was granted by a Justice of the Superior Court during a hearing on March 23, 2010.
[7] Section 7-1.2-1801 states: "[a]ll individuals who assume to act as a corporation without authority so to do are jointly and severally liable for all debts and liabilities incurred or arising as a result of that action."
[8] Section 7-1.2-1324 explains that: "[t]he dissolution of a corporation either: (a) [b]y the issuance of a certificate of dissolution by the secretary of state; or (b) [b]y a decree of court when the court has not liquidated the assets and business of the corporation as provided in this chapter; or (c) [b]y expiration of its period of duration; does not take away or impair any remedy available to or against the corporation, its directors, officers, or shareholders, for any right or claim existing, or any liability incurred, prior to the dissolution if action or other proceeding on the right, claim, or liability is commenced within two (2) years after the date of the dissolution. Any action or proceeding by or against the corporation may be prosecuted or defended by the corporation in its corporate name. The shareholders, directors, and officers have power to take any corporate or other action that is appropriate to protect the remedy, right or claim. If the corporation was dissolved by the expiration of its period of duration, the corporation may amend its article of incorporation at any time during the period of two (2) years so as to extend its period of duration."
[9] Section 7-1.2-1325 explains "[a]ny corporation dissolved in any manner under this chapter or any corporation whose existence is terminated under § 44-12-8 or any corporation whose articles of incorporation are revoked by the secretary of state under § 7-1.2-1310 nevertheless continues for five (5) years after the date of the dissolution, termination or revocation for the purpose of enabling it to settle and close its affairs, to dispose of and convey its property, to discharge its liabilities, and to distribute its assets, but not for the purpose of continuing the business for which it was organized. The shareholders, directors, and officers have power to take any corporate or other action that is appropriate to carry out the purposes of this section."
[10] For Example, § 7-1.1-98.1 is substantially similar to § 7-1.2-1325. It reads, "Any corporation dissolved in any mannerwhatever under this chapter or any corporation whose existence is terminated under § 44-12-8 or any corporation whosearticles of incorporation are revoked by the secretary of stateunder § 7-1.2-1310 nevertheless continues for two (2) years after the date of the dissolution or termination, orrevocation for the purpose of enabling it to settle and close its affairs, to dispose of and convey its property, to discharge its liabilities, and to distribute its assets, but not for the purpose of continuing the business for which it was organized. The shareholders, directors, and officers shall have power to take any corporate or other action that is appropriate to carry out the purposes of this section." (The portions which are underlinedare included in the old statute, but not the new one. The portions which are crossed out were not included in the old statute, but are included in the new one.)
[11] Cases exist which suggest that revocation acts in much the same manner as dissolution. For example, the Rhode Island Superior Court addressed a somewhat similar situation to case at bar in 1980.See M J Const. Co., Inc. v. Cape Kosher Foods, Inc., 1980 WL 340250(R.I. Super. 1980). There, the corporation's charter was revoked for failure to pay taxes. Without citing any supporting authority, the court decided that "by the voluntary act of nonpayment of its franchise tax, defendant has achieved what is in effect a voluntary dissolution under the guise of an involuntary revocation of its corporate charter." Id. Similarly, our Supreme Court has held that the so-called `trust-fund doctrine,' which passes the property of a dissolved corporation to its stockholders "applies with equal force when a corporate charter has been revoked by the Secretary of State." Friendly Home,Inc. v. Shareholders and Creditors of Royal Homestead,477 A.2d 934, 938 (R.I. 1984); see alsoPalazzolo v. State ex rel. Tavares, 746 A.2d 707 (R.I. 2000) ("Palazzolo did not become the owner of the property until 1978 because only at the time the corporation's charter was revoked did the property pass by operation of law to Palazzolo, its sole shareholder") (negative treatment on other grounds).
[12] Pursuant to § 7-1.2-1501, "[e]ach domestic corporation . . . authorized to transact business in this state, shall file, within the time prescribed by this chapter, an annual report stating: (1) the name of the corporation and the state . . . under the laws of which it is incorporated; (2) a brief statement of the character of the business in which the corporation is actually engaged in this state; (3) The names and respective addresses of the directors and officers of the corporation; (4) A statement of the aggregate number of shares which the corporation has authority to issue, itemized by classes, par value of shares, if any, and series, if any, within a class; and (6) any additional information that is required by the secretary of state." The statute continues to explain, that "the annual report must be made on forms prescribed and furnished by the secretary of state and . . . [i]t must be executed on behalf of the corporation by its authorized representative. . . . Moreover, "[t]he annual report of a domestic or foreign corporation must be delivered to the secretary of state between January 1st and March 1st of each year. . . ." Section 7-1.2-1501.
[13] A reading of Automatic Sprinkler Co. of America, reveals that the work substantially commenced and materials arrived on or about December 1, 1920; work was substantially completed on or about February 24, 1921; the notice of lien was filed on August 19, 1921; and the contract was dated October 12, 1920, some nine (9) days after the corporate charter had expired. The case was heard in the context of a receivership proceeding. Automatic Sprinkler Co. of America,306 Mo. at 523. The corporation involved was defunct and the court found that the trustee was bound by the contract. The plaintiff prevailed at trial, allowing it to collect on the work and materials provided. Id. at 524. A full reading of the case leaves the clear impression that the Missouri court was advancing the same policy as contained in R.I.G.L. § 7-1.2-1801, and set forth inKingfield Wood Products, Inc. v. Hagan, the law will protect the party victimized (by those entering into such contracts without capacity) in allowing the contractor (lienor) to collect for labor and materials even though the capacity to contract for those items did not exist at the time the contract was made. Kingfield WoodProducts, Inc., 827 A.2d 619, 623-24 (R.I. 2003); (page 13, supra), see also footnote 7 supra.
[14] Chapter 5-38 actually contains sections numbered 1 through 31, but sections 3, 13, 14, 16, 17, and 25 have been repealed.
[15] Section 5-38-30 explains, "[a] sign in boldfaced type letters at least two (2) inches high, must be displayed in a conspicuous location in every licensed auto body repair facility reading as follows:
 PURSUANT TO RHODE ISLAND LAW, THE CONSUMER HAS THE RIGHT TO CHOOSE THE REPAIR FACILITY TO COMPLETE REPAIRS TO A MOTOR VEHICLE; AND AN INSURANCE COMPANY MAY NOT INTERFERE WITH THE CONSUMER'S CHOICE OF REPAIRER.
[16] See Gendron Dep. 30 March 8, 2010 (". . . the allegations against Mr. Miller were a culmination of both State Police investigation and private insurance company investigation. And it was on the basis of the reports that they forwarded to my office that I was left with the impression that the case was about Mr. Miller either enhancing damage or overstating damage in order to obtain more money from the insurance company, which forms the basis of obtaining money by false pretenses and also insurance fraud").
[17] Plaintiff has advanced further arguments in the next section regarding his claim for Abuse of Process. Those arguments are considered in conjunction with arguments advanced on the Malicious Prosecution claim as well.
[18] The Defendant, Amica, admitted during the motion hearing before a Justice of the Superior Court on March 23, 2010 that "[t]he State Police came to Amica and said, `We're doing an investigation. Can you help us by providing us with an automobile and a pretext insurance policy to assist us in the investigation?' Amica complied with the request of the State Police." Motion Hear. Tr. 38, March 23, 2010.
[19] See Pls.'Aff. 3; see also Det.Doucet Dep. 56-57 Feb. 22, 2010 (Counsel for Plaintiff asked the Detective ". . . was it your understanding and belief that the repair estimate or appraisal that was prepared by the insurance appraiser for any given vehicle was a contract for repair with the auto body shop?" Detective answered, "That was my understanding." Furthermore, the Detective explained: "In the auto repair business, I mean, there were written estimates of repair that were completed. There were instances when you would deviate or vary from it, but generally it was close to what was, what was done. Again, I didn't understand it to be anything, anything other than that"); see alsoId. (Counsel for Plaintiff asked the Detective "isn't it true that Mr. Miller wasn't arrested in regard to the Audi only for enhanced damage; he was arrested because he didn't repair that vehicle in accordance with the appraisal? To which Detective Doucet answered, "Yes").
[20] Additionally, see earlier discussion in preceding section relative to Count III, Malicious Prosecution, and especially related to and including footnote 17, supra.